Supp. 679, affirmed 178 N. Y. 556, 70 N. E. 1109; Jaffray et al. v. Davis et al., supra. The purchase, or taking over, of the stock by the appellant paying therefor, or on the account, his *individual funds,* was something more than plaintiffs were entitled to on the theory of a copartnership liability at that time, and constituted a new agreement, which afforded a consideration for an accord and satisfaction. Allison v. Abendroth, 108 N. Y. 470, 15 N. E. 606.

These views differ with the determination of the referee on the facts in some respects, and require the reversal of the findings numbered 13 and 18, in so far as it is therein found that Hamilton was not aware of the transfer of the interest of Orlando F. Thomas to Edward R. Thomas, and findings numbered 19 and 20, in so far as it is therein found that the pool was dissolved by the transfer of the interest of Orlando F. Thomas to Edward R. Thomas, and finding numbered 24, in so far as it is therein found that the International Silver Syndicate assumed the indebtedness in the pool account, and that said International Silver Syndicate was accepted as debtor in place and stead of the pool, by the transfer thereof in form to it on the books of the plaintiffs' firm, and finding numbered 29, in so far as it is therein found that the release to the appellant was executed without consideration, and require a reversal of the judgment as against the appellant, and the dismissal of the complaint against him. See Bonnette v. Molloy, 138 N. Y. Supp. 67.

It follows that the judgment in favor of the plaintiffs against the appellant should be reversed, with costs, and the complaint dismissed, with costs.

INGRAHAM, P. J., concurs.

---

(154 App. Div. 8.)

DELEVAN et al. v. NEW YORK, N. H. & H. R. CO. et al

(Supreme Court, Appellate Division, First Department.   December 13, 1912.)

CORPORATIONS (§ 320*)—TRANSFER OF STOCK—INJUNCTION—MINORITY STOCK-
   HOLDERS—RIGHT TO SUE.
      Minority stockholders of a railroad company could not maintain a suit
   in their individual capacity to restrain a sale of the stock held by a
   majority stockholder to a competing railroad company, without any pro-
   vision for purchase of minority stock offered at the price paid for the
   majority, since the injury, if any, resulting from such sale, would be an
   injury to the corporation, and not directly to the minority stockholders.
      [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1426–1431,
   1433–1439; Dec. Dig. § 320.*]

      Laughlin and Miller, JJ., dissenting.

Appeal from Special Term, New York County.

Suit by Tompkins C. Delevan and others, on behalf of themselves and all others similarly situated, against the New York, New Haven & Hartford Railroad Company, the New York Central & Hudson River Railroad Company, and the Rutland Railroad Company. From

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

an order granting a preliminary injunction (137 N. Y. Supp. 207), defendants appeal.  Reversed.

Argued before INGRAHAM, P. J., and LAUGHLIN, SCOTT, MILLER, and DOWLING, JJ.

Edwin D. Robbins, of New York City, for appellants.

Samuel Untermyer, of New York City (Arthur M. Wickwire, on the brief), for respondents.

INGRAHAM, P. J.  This action is brought by the plaintiffs, who are stockholders of the defendant the Rutland Railroad Company, owning 1,349 shares of the common or preferred stock in that company.  It is not alleged that either of the plaintiffs own any stock in either the New York, New Haven & Hartford Railroad Company or the New York Central Railroad Company, and plaintiffs do not claim in this action to enforce any right or to recover for any damages sustained by the Rutland Railroad Company, of which they are stockholders.  They seek to maintain this action as owners of a small minority of the stock of the Rutland Company, and their right to maintain the action must depend upon the right that a minority stockholder has to enforce his individual right against the defendants.

The Rutland Company is a corporation organized under the laws of the states of Vermont and New York, and owns and operates a railroad from Ogdensburgh, in the state of New York, to Alburgh, in the state of Vermont, and thence to Rutland and Bellows Falls, in the state of Vermont, and of certain branches extending to the towns of Chatham and White Creek, in the state of New York.  It is also the owner of the capital stock of another railroad corporation, and has certain trackage agreements with certain Canadian railroad companies, and agreements with steamship lines on the St. Lawrence river and on the Great Lakes.  The Rutland Railroad also connects with a railroad known as the Boston & Main Railroad Company, operating a railroad in New England.  The New York Central Railroad is a corporation organized under the laws of the state of New York, and operates an extensive system of railroads through New York state, and, by reason of its control of the stock of other railroad companies, a system of railroads extending through many of the states of the Union, and constitutes one of the main lines between the Western states and the Atlantic seaboard.  The New York, New Haven & Hartford Railroad Company is a corporation organized under the laws of the state of New York and of the New England states, and controls the Boston & Maine Railroad.  The New York Central Railroad Company was the owner of 47,041 shares of the preferred stock of the Rutland Company and 19,940 shares of the common stock of that company, constituting a majority of the stock issued, and by virtue of that ownership controls the election of the directors of the Rutland Company.

The complaint alleges that on or about February 11, 1911, the New York Central and the New Haven Companies, contriving and intending unlawfully to restrain the trade and commerce within and among the several states and between the said states and foreign countries carried on by them and by the Rutland Railroad Company, respectively,

and contriving and intending unlawfully to monopolize such trade and commerce, and contriving and intending unlawfully to restrain and pre-- vent competition between the New York Central Company and the New Haven Company, and between the Rutland Company and the New Haven Company, in respect to such trade and commerce, entered into an unlawful combination and conspiracy with the Rutland Company and its directors to destroy competition between the Boston & Albany Railroad, forming a portion of the New York Central system, and the Fitchburg Railroad, forming a portion of the New Haven system, and to effect a virtual consolidation of the Rutland Company and the New Haven Company by various means and instruments, in-- cluding the following:

"By transferring said forty-seven thousand and forty-one (47,041) shares of the· stock of the Rutland Company held by the New York Central Com-- pany to the New Haven Company, to the end that the New Haven Company should control the ·Rutland Company, and should illegally vote all of said stock for the election of directors of the Rutland Company, and should ex-- clude the minority stockholders from a just and legal voice in the election of directors of the Rutland Company, and by entering into a partnership agree-- ment whereby the New York Central Company and the New Haven Company should equally share and divide the losses.and profits arising from the opera-- tion of the Boston & Albany Railroad."

In pursuance of said unlawful combination and conspiracy, the New York Central Company and the New Haven Company wrongfully and unlawfully entered into a contract, dated February 16, 1911, wherein and whereby it was agreed: That all competition between the Boston & Albany division of the New York Central system and the Fitch-- burg division of the New Haven system should be suppressed, and that the New York Central Company and the New Haven Company would each endeavor to develop and increase the business of the Bos-- ton ·& Albany Railroad. A copy of this agreement in annexed to the ·complaint. That—

"in further pursuance of said unlawful combination and conspiracy, the New York Central Company has already wrongfully and unlawfully transferred to the control of the New Haven Company 23,035½ shares,. constituting one-half of the controlling interest in the stock of the railroad company held by the New York Central Company, as aforesaid, at and for the price of about $105 per share."

On July 1, 1911, the New York Central Company and the New Haven Company entered upon the performance of this contract. That in and about November, 1911, in further pursuance of the said unlaw-- ful combination and conspiracy, the New York Central Company and' the New Haven Company further agreed that the remaining 23,035½ shares of the stock of the ·Rutland Company held by the New York Central Company should be transferred to the New Haven Company at and for the price of about $105 per share, and on November 20,. 1911, the executive committee of the board of directors of the New York Central Company adopted a resolution whereby the president. of the New York Central Company was authorized to sell to the New· England Navigation Company, a company controlled . by the New· Haven Company, 23,520½ shares of preferred stock of the Rutland· Company and certain demand notes of the Rutland Company held by:

the New York Central Company, amounting to $373,000, for the aggregate amount of $3,632,332.79, and upon such sale being made by the president the treasurer and secretary were authorized to execute such documents and make such transfers and take such steps as may be necessary to carry the resolution into effect. That on November 21, 1911, the New Haven Company adopted a resolution authorizing the purchase of the preferred stock of the Rutland Company and demand notes of the Rutland Company for the sum of $3,632,332.79.

The complaint then alleges that in consequence of these acts a combination or conspiracy in restraint of trade or commerce among the several states and with foreign nations formerly carried on by the railroad companies independently has been formed and is in operation, and the defendants are attempting to monopolize such interstate and foreign trade and commerce "to the great and irreparable damage of the people of the states of New York, Massachusetts, and Vermont and the United States, in derogation of their rights, in violation of the laws of the states of New York, Massachusetts, and Vermont, and the act of Congress adopted July 2, 1890," commonly known as the Sherman Act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), "to the great and irreparable damage and injury of all the minority stockholders of the Rutland Company." It is then alleged that the New Haven Company now threatens to, and unless restrained by this court will, pursuant to said unlawful combination and conspiracy, take over from the New York Central Company and pay for at the above-mentioned price of about $105 per share the remaining one-half of the controlling stock of the Rutland Company, and the New York Central Company threatens to and will, unless restrained by this court, transfer said stock to the New Haven Company, and the New Haven Company threatens to, and unless restrained by this court will, vote all the stock of the Rutland Company acquired by it in pursuance of said unlawful combination and conspiracy at all meetings of the Rutland Company to be hereafter held in favor of directors wholly dictated and controlled by the New Haven Company, and will deprive the minority stockholders of the Rutland Company of a just and legal voice in the election of directors of the Company, and will maintain and perpetuate an illegal control and domination of all the business and affairs of the Rutland Company.

It is then alleged that there are about 800 minority stockholders of the Rutland Company, who are citizens and residents of a large number of states, and the plaintiffs bring this suit on their own behalf and on behalf of all other stockholders of the Rutland Company similarly situated, who may come in and contribute to the expense of the suit and join in the prosecution thereof. And the judgment demanded is that the defendant the Rutland Company be perpetually enjoined from registering on the books of the Rutland Company any transfer of the stock of the Rutland Company from the New York Central Company to the New Haven Company, and from in any manner recognizing or accepting either the New York Central Company or the New Haven Company as the holder or owner of any shares

of the capital stock of the Rutland Company, from permitting either the New York Central Company or the New Haven Company from voting any of said stock, and from permitting any of the stockholders of the Rutland Company to vote any amount in excess of 10 per cent. of the outstanding capital stock thereof; enjoining the New Haven Company from acquiring or receiving from the New York Central Company any of the stock of the Rutland Company, from voting any of the stock of the Rutland Company, and from doing any act tending to place the capital stock of the Rutland Company under the control of the New Haven Company; that the New York Central Company be perpetually enjoined from in any manner transferring or delivering to the New Haven Company any of the capital stock of the Rutland Company, and from voting any of the capital stock of the Rutland Company; and also for a judgment adjudging that the stock of the Rutland Company heretofore transferred by the New York Central Company to the New Haven Company was illegally transferred, and setting aside and annulling such sale, appointing a receiver of the Rutland Company, and for such other and further relief as the equity of the case may require.

Upon this complaint the Special Term granted a temporary injunction restraining the New York Central Railroad Company, its stockholders, directors, officers, agents, and attorneys, and each of them, from in any manner transferring or delivering to the defendant the New Haven Railroad Company, or its representatives, any of the capital stock of the defendant Rutland Railroad Company now owned by the said New York Central Company, and enjoining the New Haven Railroad Company, its stockholders, directors, officers, agents, and attorneys, from acquiring or receiving from the defendant the New York Central Company any of the stock of the defendant Rutland Company, and enjoining the Rutland Company from registering on its books any transfer of its stock from the New York Central Railroad Company to the New Haven Railroad Company; and from the order granting that injunction the defendants appeal.

While there is a general allegation in the complaint as to the irreparable injury that this transfer will cause to the minority stockholders of the Rutland Company, no fact is alleged which would justify an inference of such damage. Before the agreements alleged in the complaint, and which are complained of, were made, the New York Central Company owned a majority of the stock of the Rutland Railroad Company, after such transfer is completed, the New Haven Company will own a majority of the stock of the Rutland Company, and it is not suggested upon what principle the minority stockholders of the Rutland Company will suffer by this transfer of control. It is alleged that the New Haven Company and the corporation which it controls compete with the Rutland Company, but that is strenuously denied by the defendants, they claiming that the Rutland Company is a connection or extension of the New Haven road rather than a competing road; and it certainly is not clearly established that as the roads exist at present there can be any substantial competition between them. The mere fact that passengers could by a devious and extended

route, which would not be practicable as a transportation proposition, pass over the lines of the New Haven Company or railroads controlled by it from one point to another on its system, which points are also on the system of the Rutland Railroad, does not establish that they are competing roads. I do not suppose that the New Haven Railroad could be said to be in competition with the New York Central Railroad for passenger and freight business between New York and Albany, because a passenger could go from New York to Boston and from Boston to Albany over the New Haven Railroad.

But in the view that I have of the controlling principles that must determine the questions submitted to us it is not necessary to determine this question. What is apparent is that the New York Central Railroad and the systems which it controls are much greater competitors of the Rutland Railroad than the New Haven Railroad can ever become, and certainly, if it would be illegal for the New Haven Railroad to acquire a majority of the stock of the Rutland Railroad, it would be equally illegal for the New York Central Railroad to hold a majority of that stock; and its continuous ownership of that stock, which involves the control of the Rutland Railroad, is a more serious violation of the laws of the United States than the control of the Rutland Railroad by the New Haven Company would be. Accepting the allegations of the complaint, the New York Central Company, being the owner of a majority of the stock of the Rutland Railroad and controlling its operation and management through the ownership of such stock, has been violating the federal law for years and subjecting itself to the penalties imposed by that act. It now seeks to relieve itself from this unlawful position by transferring its stock to another railroad, and the effect of the injunction granted below is to restrain the New York Central Railroad from ceasing to violate the federal law in transferring its stock to another corporation, because it is alleged that the other corporation will also violate the law if it acquires the stock. Just how this could possibly affect the rights of the minority stockholders is difficult to understand. The object of this attack upon the right of the New York Central Railroad to sell its stock is, however, quite frankly stated in the brief of the learned counsel who appeared for the respondent, as, indeed, it fairly appears from the allegations of the complaint.

It appears from the record, and is repeated in the brief, that the position of the Rutland minority stockholders' committee before the Public Service Commission, when this question as to allowing this transfer of stock was before it, was that in any event the control should not be allowed to pass, unless adequate provision was made for the protection of the minority stockholders, and that this could not be accomplished, except by requiring the purchasing company to pay for such minority stock as may be offered the same price as it had agreed to pay for the majority stock, namely, about $105 per share. And complaint is made that the Public Service Commission, in passing upon the application of the New York Central Railroad to acquire the stock of the Ontario & Western Railroad Company, decided that such leave should not be granted, except by imposing as a condition of

authorization that the Central Company should take over such minority stock as may be offered it upon the same terms per share as it paid to the New Haven Company, and that the Public Service Commission granted the application of the Central Company to turn over the control of the Rutland Company to the New Haven Company without imposing the slightest condition or restriction for the protection of the minority.

One of the plaintiffs' contentions, as stated by the learned counsel for the respondents, is that:

"Without regard to the anti-trust law, and even if the transaction were otherwise lawful, one corporation will not be permitted to acquire the bare control of a competitor, with all the opportunities and temptations for oppression and discrimination presented by such a situation, without at least being required to offer to the minority holders the opportunity to sell their holdings on the terms on which the majority is being acquired. The ordinary dictates of common fairness require that such a condition be imposed before the minority interest can be subjected to such changed control."

And a point in the respondent's brief is devoted to an attack upon the Public Service Commission for granting this application without requiring the New Haven Railroad to purchase at the same price the stock held by the minority stockholders.

It must be quite apparent from this record that the injury that these plaintiffs complain of was caused by the refusal of the New Haven Railroad to purchase their stock at the same price as the stock was purchased from the New York Central Railroad, and that the object of the minority stockholders' objection before the Public Service Commission and this litigation is to force the New Haven Railroad to purchase their stock at the price at which they have purchased the majority stock from the New York Central Railroad. It is certainly a doubtful proposition whether a court of equity will allow its process to be used to accomplish such a purpose; but certainly a court of equity will not by its injunction prevent a corporation from transferring a control which it is alleged is in violation of the federal statutes, because the purchaser of the control will probably violate the same law that the seller of the stock is charged with having violated. If the allegation as to the effect of the control of the New York Central Company over the business of the Rutland Company is sustained, certainly the interests of the Rutland Company and its minority stockholders would be greatly conserved if its stock was transferred to another company, which would not have the same motive for making the alleged discriminations against the Rutland Company.

There is one legal question, presented at the outset of this investigation, which, however, renders further discussion of these questions unnecessary, and that is as to the right of the plaintiffs as minority stockholders to maintain this action or obtain any of the relief they ask. As before stated, the plaintiffs are owners of a minority of the stock of the Rutland Railroad. They do not ask in this case to enforce the rights of the Rutland Company, but simply their rights as owners of a minority of the stock. The facts upon which a minority stockholder can base a cause of action against a majority stockholder have been a question which has been greatly discussed, and which in

several jurisdictions has led to a considerable difference of opinion; but in this state, at least, the rights that a minority stockholder can enforce against the holders of a majority of the stock have been strictly limited. The distinction between an action brought by a minority stockholder to enforce a right of the corporation whose stock he holds and the right of a minority stockholder to enforce a right of action vesting in himself as a stockholder is clearly stated in the opinion of Mr. Justice Laughlin in the case of Niles v. N. Y. Central & H. R. R. R. Co., 69 App. Div. 144, 74 N. Y. Supp. 617. It is there distinctly stated that a violation of the duty of the holders of a majority of the stock to manage a corporation in good faith in the interest of its stockholders imposed a liability in favor of the corporation, and this obligation can be enforced only by the corporation or by a suit instituted in its behalf; that a depreciation in the value of the stock as the result of wrongs committed against the corporation did not give to a stockholder suffering from such a depreciation a cause of action against the holders of a majority of the stock. As was said by Mr. Justice Laughlin in that case:

"The plaintiff has been damnified; but the damages sustained by him flow from the wrong committed against the corporation, and are, in contemplation of law, remote, indirect, and consequential. Where, as here, the common law prevails, such damages are not recoverable, except in the right of the corporation. * *, * Even though the depreciation in the value of the stock be capable of ascertainment as a basis of damages at law, the wrongs complained of are wrongs against the corporation, and it has a cause of action for the restoration of the property or for the damages sustained. It is presumed that a diligent enforcement of these remedies will result in the restoration of the corporate property or its equivalent, and will afford adequate indemnity to the stockholders. A recovery in such case by the stockholders in their own right would not be a bar to a recovery of the same damages by the corporation. A double recovery has not been permitted in these actions up to the present time, either at law or in equity."

And this case was affirmed by the Court of Appeals in 176 N. Y. 119, 68 N. E. 142, where the court said:

"True, the plaintiff has suffered a depreciation in the value of his stock as a result of the wrong, and in this respect the injury was personal to the holders of the stock. But every stockholder has suffered from the same wrong, and if the plaintiff can maintain an action for the recovery of the damages sustained by him, every stockholder must be accorded the same right. The injury, however, resulting from the wrong, was, as we have seen, to the corporation. The depreciation in the value of the plaintiff's stock, and that of the other stockholders, was in consequence of the waste and destruction of the property and franchise of the corporation. There are wrongs which, if committed against a stockholder, entitle him to a right of action against the person committing the wrong for the damages sustained, as, for instance, where a person had been induced to purchase stock in a corporation and pay a higher price than the stock was fairly and reasonably worth, or where the owner of stock had been induced to part with it for a less sum than its true value, by reason of false and fraudulent representations of others with reference to its value. But these wrongs are distinguishable from those against the corporation. They result in injury to the stockholder upon whom the wrong is practiced, but do not injure the other stockholders or the corporation itself. The injuries, however, in this case, are not of that character. The defendants had obtained control of the affairs of the corporation through the board of directors elected by them. These directors undertook to manage the property of the corporation in good faith, according to their

best judgment and skill, in the interests of all of the stockholders. Having assumed the management, they were bound to use their best endeavors to prevent default in the payment of interest and the consequent sacrifice of the corporate property. Under the allegations of the complaint, the directors of this corporation not only failed to discharge their duties to the stockholders, but they actively participated in the depletion of the company's treasury and in a sacrifice of the company's property, thus depriving the stockholders and the creditors of that which belonged to them."

The court then cites from Judge Vann's opinion in the case of Flynn v. Brooklyn City R. R. Co., 158 N. Y. 493, 53 N. E. 520:

"Where a majority of the directors, or stockholders, or both, acting in bad faith, carry into effect a scheme which, even if lawful upon its face, is intended to circumvent the minority stockholders and defraud them out of their legal rights, the courts may interfere and remedy the wrong. Action on the part of directors or stockholders, pursuant to a fraudulent scheme designed to injure the other stockholders, will sustain an action by the corporation, or, if it refuses to act, by a stockholder in its stead for the benefit of all the injured stockholders."

That was an action to recover the damages sustained by the corporation in consequence of an illegal act of the majority, after such acts had been committed and the corporation and its stockholders injured thereby; while in this case the majority stockholders are to be restrained from disposing of their stock, because such a result might happen by virtue of the control of the New Haven Railroad Company over the corporation. Certainly if, after the wrong has been committed, a minority stockholder cannot sue to recover damages caused to his stock by such wrongful and illegal acts, such minority stockholder cannot have a cause of action in equity to restrain the acquisition of a majority of the stock by an individual or corporation because it is possible that similar results would follow the acquisition of a majority of the stock.

The question as to the right of the corporation itself to maintain this action was presented to the United States Circuit Court in the case of Hunnewell v. N. Y. Central & H. R. R. Co., 196 Fed. 543, and in that case Judge Noyes, in refusing an application for an injunction, said:

"The conclusion reached from the examination thus far is that the complainant in this suit is not entitled to an injunction restraining the sale of said shares. If, however, this conclusion were not reached and this suit was treated as one by the stockholder in his own interest, it would still be impossible for us to grant an injunction upon the ground of want of application to the Public Service Commission, because it now appears that such application has been made."

But these cases only follow the principle established in a line of cases of which McHenry v. Jewett, 90 N. Y. 58, is the leading case, in which Chief Judge Andrews said:

"It is not sufficient, to authorize the remedy by injunction, that a violation of a naked legal right of property is threatened. There must be some special ground of jurisdiction, and, where an injunction is the final relief sought, facts which entitle the plaintiff to this remedy must be averred in the complaint and established on the hearing. The complaint in this case is bare of any facts authorizing final relief by injunction. It is true that it is alleged that the defendant, by the use of the shares, has been enabled to a great ex-

tent to contròl the management of the combination in the interest of the New York, Lake Erie & Great Western Railway Company, with little or no regard to the best interests of the company issuing the shares. But there are no facts supporting this allegation, nor is it averred that the interests of the latter company have been prejudiced, or that the value of the shares has been impaired by the acts of the defendant. So, also, it is alleged that it is greatly against the plaintiff's interest as a shareholder to permit the defendant to vote upon the shares, and that the plaintiff will suffer great and irreparable injury, if the defendant is permitted to do so. But no facts justifying these conclusions are stated, and the mere allegation of serious or irreparable injury, apprehended or threatened, not supported by facts or circumstances tending to justify it, is clearly insufficient."

See, also, Gamble v. Queens County Trust Co., 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527; Colby v. Equitable Trust Co., 124 App. Div. 262, 108 N. Y. Supp. 978, affirmed 192 N. Y. 535, 84 N. E. 1111; Flynn v. Brooklyn City R. R. Co., 158 N. Y. 493, 53 N. E. 520.

And that principle has been uniformly followed in this court and in the Court of Appeals. It is clear that neither in the complaint in this action nor in the evidence submitted to the Special Term was there allegation or proof that this transfer to the New Haven Company has caused or could cause any injury to the plaintiffs or other minority stockholders, except so far as such a transfer would injure the corporation and thus indirectly depreciate the value of the plaintiffs' stock. In fact, Mr. Justice LAUGHLIN'S opinion conclusively establishes that in this case the plaintiffs have sustained and can sustain no damage by reason of the transfer of the Rutland stock to the New Haven Company, so far as it has been completed, or by the contemplated transfer of the remainder of the stock owned by the New York Central Company, unless, indeed, the plaintiffs have been damaged by the refusal of the Public Service Commission to compel the New Haven Company to purchase the plaintiffs' stock for the same price that the defendant New Haven Company paid the New York Central Company, a damage which I think will be conceded cannot be the basis of an injunction to restrain the New York Central Company from selling, or the New Haven Company from buying, the stock at a price which the parties may agree to. There is no allegation that the plaintiffs' stock has decreased in value by reason of this sale of the New York Central's holdings, and an allegation as to the method by which the New York Central Company has decreased the value of the plaintiffs' stock by virtue of its management of the Rutland Company would tend to show that it was a distinct advantage to the plaintiffs, as stockholders of the Rutland Company, to have the management changed, so that such discrimination against the Rutland Company should not be continued. Applying, therefore, the principle that has been established and uniformly applied in this state for many years, it would seem clear that plaintiffs neither alleged in the complaint nor submitted proof by affidavit which would justify the court in restraining the owner of the stock of the railroad from selling it to whom it pleased and at any price the purchaser would agree to pay.

We have, however, the allegation upon which the plaintiffs seem to lay great stress, and upon which, as I understand Mr. Justice

LAUGHLIN'S opinion, he concluded that the plaintiffs are entitled to an injunction: That this transfer will involve in some way a violation of the statute of the United States known as the Sherman Act. The first section of the Sherman Act makes every contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce among the several states or with foreign nations illegal, and section 2 provides that every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce among the several states or with foreign nations shall be deemed guilty of a misdemeanor. And it is alleged that this sale of the New York Central Company to the New Haven Company is a contract, combination, or conspiracy in restraint of trade or commerce and is therefore illegal. The Supreme Court of the United States has lately arrived at a comprehensive construction of the meaning of these provisions in the Standard Oil Case, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, and in U. S. v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663.

It is unnecessary that we should attempt to determine whether or not these contracts are a violation of this statute, or that the sale of this stock by the New York Central Company would be a part of or the carrying out of an illegal contract; for it appears to me clear that a violation of this statute by the New York Central Company or the New York, New Haven & Hartford Railroad Company gives to the plaintiffs as stockholders of the Rutland Railroad Company no right of action to enforce this statute. We may assume, without deciding, that the Rutland Railroad Company, whose stock is being transferred in pursuance of an agreement which is illegal and void under this statute, would have a right to enjoin a transfer of control which would be necessary to carry into effect the void agreement, although it is difficult to understand how the Rutland Company could be affected injuriously or otherwise because two of its stockholders have entered into an agreement which the law of the land has declared to be illegal and which makes those taking part in it guilty of a crime. It is not alleged that the Rutland Company is a party in any way to the contract. Two of its stockholders have entered into what is claimed to be an illegal contract, and if they have violated the law the parties to the contract are those who must bear the penalty. There is nothing in the law, and nothing is suggested, to show that the Rutland Railroad Company would be subject to any penalty because of the making of this contract by two of its stockholders. Its right to exercise its franchise could not possibly be affected, the corporate existence could not be threatened, and no injury could possibly be inflicted upon it.

But, even assuming that the Rutland Railroad Company would have a cause of action, each of its stockholders certainly would not have. No act of the New York Central Company and the New Haven Company could possibly impose any liability upon the minority stockholders protesting against the action of the majority stockholders in selling its stock. These plaintiffs occupied no other relation to this transfer of stock by the New York Central Company to the New Haven

Company than did any other citizen whose interest it is to see to it that the laws are maintained. If this contract and transfer is a violation of the Sherman Act, the remedy is an action by the federal authorities to enforce the federal laws. Certainly the Supreme Court of the state of New York has no power to impose a penalty upon either of these railroad companies or their officers or directors who have united in this contract for a violation of the Sherman Act. This court could not indict or punish these defendants for any violation of its provisions; nor could it enforce any right which was violated by the Sherman Act, as no power is given by that act to the state courts to enforce it or to prevent by injunction or otherwise its violation. And certainly, applying the rule before stated, which is the settled law of this state as to the cases in which a minority stockholder will be allowed to apply to the court for relief as against a majority stockholder, there is nothing either alleged or proved in this case that would make a violation of a federal statute by the New York Central Railroad Company or the New York, New Haven & Hartford Railroad Company a ground of action for any relief in the courts of this state. An examination of all the authorities cited by the learned counsel for the plaintiffs on this question would only extend this opinion. They have all been examined, but none of them are authorities against the proposition controlling upon this court which is the settled law of this state, and by that it seems to me clear that the plaintiffs have no cause of action.

The order appealed from must therefore be reversed, with $10 costs and disbursements, and the motion denied, with $10 costs.

SCOTT, J., concurs.

DOWLING, J. I concur in the result reached, upon the ground that the plaintiffs cannot maintain this action, nor obtain the relief which they seek, not having alleged any damages sustained by them, as distinguished from those sustained by the corporation.

LAUGHLIN, J. (dissenting). The plaintiffs own 1,349 shares of the capital stock of the Rutland Railroad Company, for brevity hereinafter referred to as the "Rutland Company," a corporation organized under the laws of New York and Vermont; and they bring this action in behalf of themselves and all other stockholders of the Rutland Company similarly situated, and they claim to represent directly 6,151 shares and indirectly 15,000 additional shares of the capital stock. The outstanding capital stock of the Rutland Company is 90,000 shares. The New York Central & Hudson River Railroad Company, which will be referred to as the "Central Company," in 1905 acquired stock control of the Rutland Company by the purchase of 47,041 shares of the capital stock; and in February, 1911, it transferred one-half of this stock to the New York, New Haven & Hartford Railroad Company, which will be referred to as the "New Haven Company," and thereupon three of the directors of the Rutland Company, theretofore elected to represent the Central Company, resigned, and three directors of the New Haven Company, one of whom was its president, were elected to succeed them. The Central Company, since it obtained

stock control of the Rutland Company, has controlled its policy and business. The plaintiffs charge, in effect, that the Central and New Haven Companies entered into a conspiracy to stifle competition and to obtain a monopoly of the transportation business in the territory in question, to the detriment of the Rutland Company, the control of which will pass to the New Haven Company, a rival, parallel, and competing line, by the transfer of the remaining shares of Rutland Company stock held by the Central Company, unless the transfer thereof shall be enjoined, and that the transfer and threatened transfer of such stock by the Central Company is a violation of the duty it owes, as the owner of the majority of the stock, to the stockholders of the Rutland Company, and in violation of the Sherman Act, so called, being an act of Congress of July 2, 1890, entitled "An act to protect trade and commerce from unlawful restraints and monopolies," section 1 of which declares that:

"Every contract, combination in the form of a trust or otherwise, or conspiracy in restraint of commerce among the several states, * * *" is illegal.

### And section 2 of which provides that:

"Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of the trade or commerce among the several states * * * is guilty of a misdemeanor."

It is alleged that the laws of Vermont prohibit any stockholder from voting on more than 10 per cent. of the capital stock of the company, and, in the event that the transfer is not enjoined, an injunction against the New Haven Company and the Rutland Company is prayed for, limiting the voting power of the New Haven Company accordingly. It would not be proper to express an opinion on the merits with respect to the controverted facts at this time; but the decision of the appeal requires that the material facts alleged and supported by affidavits, even though controverted, be stated, for on the sufficiency thereof to present a prima facie case depends the right of the plaintiffs to have the injunction continued.

The plaintiffs allege that the Rutland Company owns and operates a railroad extending from Ogdensburg, N. Y., to Alburgh, Rutland, and Fellows Falls, Vt., with branches extending to Chatham and White Creek, N. Y.; that it owns all the capital stock of the Rutland & Noyan Railway Company, which owns and operates a short line from Alburgh to Noyan Junction, near the Canadian line, and thereby controls that company; that it has trackage agreements with the Quebec, Montreal & Southern Railway Company and the Canadian Pacific Railway Company, under which it runs and has the right to run its own trains over said lines between Noyan Junction, Iberville Junction, and Montreal; that it owns all the capital stock of the Rutland Transit Company, which is a duly authorized common carrier of passengers and freight by steamboats, and owns and operates a line of steamboats plying between Ogdensburg and Chicago and intermediate points, and thereby controls the business of that line; that at Bellows Falls it connects with a line of railroad controlled and operated by the Boston

& Maine Railroad, extending to Boston; that between White Creek and Troy, by virtue of trackage rights, it operates trains, and at Troy connects with railroad lines to New York, and with water transportation on the Hudson river; that the Central Company owns and operates a railroad line between New York and Buffalo, via Albany, Troy, and intermediate points, and owns and operates, through stock control or leases, various other railroads traversing the states of New York, Pennsylvania, Ohio, Indiana, Illinois, and Michigan, and between Buffalo, Detroit, and Chicago and intermediate points, and between Buffalo and Montreal, and the Western Transit Company, which operates steamboats on the Great Lakes as a common carrier of passengers and freight, and owns and operates the Boston & Albany Railroad Company by virtue of a lease for 999 years, made July 1, 1900, and that the Boston & Albany extends from Boston to Albany, passing through Worcester, Springfield, and·Pittsfield, which are reached by lines connecting with the Rutland Company; that the New Haven Company is a corporation organized and existing under the laws of Connecticut, Massachusetts, and Rhode Island, and owns and operates various lines of railroad from New York to New London, New Haven, Bridgeport, Providence, Hartford, Pittsfield, Worcester, Springfield, and Boston, and intermediate points, and owns and controls a majority of the capital stock of the Boston Railroad Holding Company, which through majority stock ownership controls the Boston & Maine Railroad Company, which by virtue of agreements and leases and stock ownership owns and controls the Connecticut River Railroad Company, which through stock ownership owns and controls the Vermont Valley Railroad Company; that the Boston & Maine Company owns and controls and operates a large system of railroads in Massachusetts, Maine, New Hampshire, Vermont, and New York, extending to Portland and Bangor on the Atlantic coast, to White River Junction, Vt., and there connects with the Central Vermont Railroad, extending to East Swanton, where connection is made with the Grand Trunk Railway, extending to Iberville Junction, Montreal, and other points in Canada; that the Boston & Maine also owns and operates a line extending to Newport, Vt., where connection is made with the Canadian Pacific for Iberville Junction, Montreal, and other Canadian points, and also owns and operates a line extending from Bellows Falls to Windsor, where connection is made with the Central Vermont for Burlington, Vt., which is on the Rutland line, and with East Swanton, where connection is made with the Grand Trunk for Iberville Junction and Montreal and other points; that the Boston & Albany owns and controls the Fitchburg Railroad, extending from Boston to Troy and Rotterdam Junction, and owns and operates a line from Windsor, Vt., to Springfield, where connection is made with the New Haven Company's line extending to New York; that the New York, Ontario & Western Railway Company owns in its own right, or by stock control, or leases and operates, a railroad between Cornwall, on the Hudson river, and Oswego, on Lake Ontario, extending to various points in Central and Southern New York and Northern Pennsylvania, and touching Kingston, Utica, Rome, and Oneida, and operates its freight and passenger

trains over the West Shore Railroad from Cornwall to Weehawken, N. J., under a lease which continues until the year 2089; that in 1904 the New Haven Company acquired a controlling interest in the stock of said New York, Ontario & Western Railroad Company, and has ever since elected the directors thereof, and has thereby dominated and controlled the business and affairs of said company; that in January, 1905, the Central Company acquired stock control of the Rutland Company, and has ever since elected its directors, and has thereby dominated and controlled its business affairs; that the Rutland Company and the New Haven Company have owned, controlled, and operated, and own, control, and operate, two separate, parallel, and competing lines; that they are competing and parallel lines among other respects, in that there are four parallel and competing lines between Iberville Junction and Montreal and other Canadian points on the north, and Boston on the south, viz.: (1) The Boston & Maine Railroad Company and the Rutland Company from Bellows Falls and the latter's Canadian connections; (2) via Boston & Albany Railroad, controlled by the Central Company, and the Rutland Railroad from Chatham and its Canadian connections; (3) via Boston & Maine Railroad to White River Junction, thence via Central Vermont Railroad and the Grand Trunk Railway which controls it; (4) via Boston & Maine to Newport, Vt., and thence by Canadian Pacific—which four lines have for some years past been in active competition in freight and passenger traffic, including coastwise, interstate, and foreign commerce; that the Rutland Company's line from Bellows Falls to Burlington, Vt., is parallel with, and is and has been competing with, the line between said points over the Boston & Maine and Central Vermont Railroads; that the Rutland Company's two lines formed by its own road and its Canadian connections on the north, from Montreal, via White Creek Junction, Troy, and the Central Railroad, to New York, and from Montreal, via Chatham and the Harlem Railroad, to New York, are, and for some years past have been, parallel and competing lines with the New Haven line from New York to Montreal, via Windsor, Vt., and the Central Vermont and Grand Trunk Railroads; that a differential line, so called, extending from Boston via the Boston & Albany to Chatham and the Rutland Railroad to Ogdensburg and the Great Lakes via the Rutland Transit Company's steamboats, or to Norwood and thence westerly by the Central Railroad, is and for some years past has been a parallel and competing line with the differential lines from Boston via the Boston & Maine to Newport or White River Junction and the Canadian Pacific and Grand Trunk Railroads to the Great Lakes and other Western points, and is and has been a parallel and competing line with the line from Boston via the New Haven Railroad and the New York, Ontario & Western and the Great Lakes. It is also alleged that the Fitchburg Railroad, controlled by the New Haven Company, has been and is parallel and competing with the Boston & Albany between Boston and Troy and Rotterdam Junction and Albany.

The plaintiffs further allege that prior to the 16th day of February, 1911, the Central and New Haven Companies, contriving and intending unlawfully to restrain trade and commerce within and among

the several states and between the states and foreign countries heretofore carried on by them and by the Rutland Company, and to monopolize such trade and commerce, and to prevent competition between said railroads, entered into an unlawful combination and conspiracy with the Rutland Company, its directors, and others to destroy competition between the Boston & Albany Railroad, controlled by the Central Company, and the Fitchburg Railroad, controlled by the New Haven Company, "to effect a virtual consolidation of the Rutland Company and the New Haven Company," and for the purposes aforesaid and to that end contemplated having the Central Company transfer to the New Haven Company a controlling interest in the capital stock of the Rutland Company, then held by the Central Company, consisting of 47,041 shares, to enable the New Haven Company to elect and control the directors of the Rutland Company, and to share equally the profits arising from the operation of the Boston & Albany Company, and to divide ·the losses, if any, therefrom, and on the said last-mentioned day entered into a contract in writing for the suppression of competition between the Boston & Albany division of the Central Railroad and the Fitchburg division of the New Haven Railroad, and to share the profits and divide the losses of operation of the Boston & Albany Company as partners, the agreement to take effect July 1, 1911, and to continue for 10 years, after which period it was to be terminable by either party on one year's notice, and for the transfer of one-half of the Central Company's holdings of capital stock in the Rutland Company at $105 per share; that the stock was transferred pursuant to said agreement, and thereupon, in furtherance of said combination and conspiracy, the New Haven Company caused its president and director and two others of its directors to be elected directors of the Rutland Company, and that ever since the Central and New Haven Companies have acted in the premises in furtherance of said conspiracy, and on the 27th day of December, 1911, the executive committee of the Central Company, in further consummation thereof, adopted a resolution authorizing the president of the company to sell one-half of its holding in the capital stock of the Rutland Company, with a note of the Rutland Company, and the rights and interests of the Western Transit Company in certain contracts between it and the Rutland Transit Company relating to six steel steamers then in service on the Great Lakes, which rights and interests the president of the New Haven Company was authorized to acquire for a price not less than $3,632,-332.79, and to divide the proceeds between the Central Company and the Western Transit Company according to their respective interests; that this resolution specified no purchaser, but immediately prior to its adoption a resolution adopted by the same board on November 20, 1911, which authorized this sale at the same price to the New England Navigation Company, was rescinded; that on the 21st day of November, 1911, the executive committee of the board of directors of the New England Navigation Company, the stock of which was all owned by the New Haven Company, adopted a resolution to purchase this stock, the note, and rights and interests in the steamers

for the consideration specified in said resolution adopted and rescinded by the executive committee of the board of directors of the Central Company; that said companies threaten and intend to consummate the transfer of the property mentioned in said resolutions, and unlawfully to suppress and destroy competition between each other and the New Haven Company and the Rutland Company; that in violation of the laws of Vermont, which require that a majority of the directors shall be residents of that state, and provide that no stockholder shall be entitled to vote more than 10 per cent. of the capital stock of the company, the Central and New Haven Companies, at the annual election of directors of the Rutland Company held in October, 1911, voted all of the stock, which had been previously held by the Central Company, and elected a board of directors, the majority of whom were not residents of Vermont; that the New Haven Company has caused the offices of general superintendent and chief engineer and other officers of the Rutland Company to be filled by its officers and nominees, and has practically taken charge of the affairs of the Rutland Company, and threatens and intends to vote all of said stock, and to deprive the minority stockholders of a just and legal vote in the election of directors, and "to maintain and perpetuate an illegal control and domination of all of the business and affairs of the Rutland Company," and threatens to "conduct all the business and affairs of the Rutland Company for the sole benefit and profit of the New Haven Company and in violation of the rights of the minority stockholders, and will continue to exercise the above-mentioned unlawful domination and control over the affairs of the Rutland Company, and will continue to suppress and throttle competition on the part of the Rutland Company both with the New Haven Company and with the New York Central Company, all to the great and irreparable damage of the Rutland Company, and particularly the minority stockholders thereof," and will do so unless restrained by the court, and that the directors of the Rutland Company threaten to, and will, unless enjoined, assist in carrying out the terms of said unlawful combination and conspiracy, and to permit the Rutland Company to be managed and controlled and its business carried on by the directors so illegally elected, "and will permit all competition between the Rutland Company and the New Haven Company to be suppressed, and will by the foregoing means render the charter of the Rutland Company subject to forfeiture, and the company subject to the pains and penalties prescribed by said 'act to protect trade and commerce from unlawful restraints and monopolies,' " and will do so unless restrained by the court; that said acts are ultra vires of the Rutland Company and are contrary to the laws of Vermont and New York and to the act of Congress known as the Sherman Act.

The prayer for relief, so far as material to the decision, is that the Rutland Company, its directors, officers, and agents, be enjoined from registering on its books any transfer of said stock pursuant to said agreement, and from permitting either company to vote thereon, and from permitting any stockholder of the Rutland Company to vote

more than 10 per cent. of the capital stock, and from recognizing said transfers of the Rutland Company's stock, and from doing any act or thing in furtherance of said unlawful combination and conspiracy, and that the Central and New Haven Companies be enjoined from further consummating said contract, and from voting said stock, and doing any act or thing in furtherance of said combination and conspiracy, and that the transfer of said stock by the Central Company to the New Haven Company, in so far as it has been consummated, be annulled, and that an injunction pendente lite be granted.

The affidavits and evidence presented by the respondents tend to sustain all of the material allegations of the complaint, and tend to show that the Rutland Company, with its rights to operate its trains over other lines as aforesaid, and the New Haven Company are actually and potentially competitors for interstate trade and commerce from New England and Atlantic coast points to the Great Lakes and ports thereon and other points, as well as for such trade and commerce between most of the New England states and Canada. The moving papers further show that the market value of the stock of the Rutland Company is only $40 per share, and that President Mellen, of the New Haven Company, considers that for the purpose of enabling his company to control the Rutland Company a bare controlling interest in the stock is worth $105 per share, and that he regards it as the right of one corporation, thus having stock control of another, to dispose of such stock control as may seem best for its own interests, and that he testified before the Public Service Commission that the purchase of this stock "was born of a desire to help the B. & M." (meaning the Boston and Maine, which is controlled by the New Haven Company) particularly, and the New Haven Company "somewhat, but less." It further appears that officers of the New Haven Company admitted before the Public Service Commission that the Rutland and New Haven Companies compete and are parallel to some extent. Mr. Mellen and other officers of the New Haven Company also testified that the interests of the New Haven Company in operating the Rutland Company with respect to developing the business of the Rutland Company are not in conflict, and that while it would be possible for the New Haven Company, through this stock control, to divert business from the Rutland Company to a large extent, such is not its intention.

But the respondents have a right to expect that, in determining whether the temporary injunction should be vacated, the court will take the most favorable view to them of the affidavits and testimony and admissions of the officers of the appellants. It may be observed that it is at least doubtful whether the New Haven Company would pay nearly three times the market value of this stock for the purpose of controlling the Rutland Company, unless it is to obtain some advantage thereby at the expense of the Rutland Company. The respondents also present evidence tending to show that the New Haven Company is rapidly obtaining a monopoly of the New England interstate and international trade and commerce.

The learned counsel for the appellants contends that this case falls

within the doctrine of the authorities holding that the cause of action, if any, is in the corporation, and can only be maintained by a stockholder in the right of the corporation upon alleging, as a basis therefor, that the corporation, on demand duly made, has refused to bring the action, or facts showing that such demand would be futile. The learned counsel for the respondents does not endeavor to sustain the action as one in the right of the corporation, and contends that it is brought in the individual rights of the plaintiffs as stockholders. Whether the action is brought in the right of the corporation or in the individual rights of the stockholders depends upon the allegations of the complaint, for the *form* of the action in either event would be the same. It is not alleged that a demand was made upon the corporation to bring the action; but such demand is unnecessary, if facts are alleged from which it appears that it would be futile. I am of opinion that such facts are sufficiently alleged here; for the corporation can only act through its board of directors, and the majority of the board of directors represent the New Haven and Central Companies, and it is in effect charged that they entered into a conspiracy with those companies pursuant to which the transfer of stock sought to be annulled and enjoined has been made or is threatened. As I view the case, therefore, if a good cause of action has been pleaded upon either theory, that will suffice to sustain the injunction.

This action is neither brought to recover damages sustained by the corporation nor for an accounting by any of the officers of the corporation or by others. The plaintiffs sue to *enjoin* the consummation of threatened illegal acts by which the control of the corporation will be turned over to a rival competing line, which will be permitted, through its ownership of a majority of the stock, to elect and control the board of directors, and dictate the policy and manage the affairs of the corporation of which the plaintiffs are minority stockholders; and it is charged that such acts are not for the best interests of the Rutland Company, and are designed to give the New Haven Company an advantage over it, and that such will be their effect, and this charge is fairly substantiated. The plaintiffs allege that they will be damaged in their rights as stockholders, upon the ground that the Rutland Company will be subjected to penalties for violations of the Sherman Act, and that its earnings will be depreciated by a diversion of its business to the New Haven Company and otherwise. The only acts which the *Rutland Company* threatens to do, which it is alleged are a violation of the plaintiffs' rights or of law, are the recognition of the transfer and the acceptance of the surrender of the stock, and the issuance of new stock to the New Haven Company, and the recognition of the right of the New Haven Company to vote on the stock. It is not apparent how those acts would subject the Rutland Company to penalties under the Sherman Act, even though the transfer of the stock by the Central Company to the New Haven Company be a violation thereof; but, however that may be, the plaintiffs would not be affected by the damages which it is alleged will ensue, excepting as stockholders, and the same as all other stockholders, and therefore, with respect to those matters, the cause of action would be vested

in the corporation, and could not be maintained by minority stockholders, excepting in the right of the corporation. Niles v. N. Y. C. & H. R. R. R. Co., 69 App. Div. 144, 74 N. Y. Supp. 617, affirmed 176 N. Y. 119, 68 N. E. 142; Flynn v. Brooklyn City R. R. Co., 158 N. Y. 493, 53 N. E. 520; Howe v. N. Y., N. H. & H. R. R. Co., 142 App. Div. 451, 126 N. Y. Supp. 1090; Cook on Injunctions (6th Ed.) §§ 644, 645, 646, 647, 662, 734, 738, 740; High on Injunctions (4th Ed.) §§ 1203, 1207, 1216, 1223a, 1224.

In Shawnee Compress Co. v. Anderson, 209 U. S. 423, 28 Sup. Ct. 572, 52 L. Ed. 865, upon which counsel for the respondents relies as authorizing an action by a stockholder in his own right for *affirmative* relief other than an injunction, the *form* in which the action was brought was not considered in the opinions delivered in the Supreme Court of the United States or in the report of the opinion of the Supreme Court of Oklahoma (Anderson v. Shawnee Compress Co., 17 Okl. 231, 87 Pac. 315, 15 L. R. A. [N. S.] 846), and the action was sustained *after the consummation* of the act in violation of the Sherman Act and a lease illegally executed was annulled. In this jurisdiction, unless the fact that the execution of the lease was in violation of the express provisions of the statute distinguishes it from other cases, that action could only have been maintained by the stockholder in the right of the corporation. Flynn v. Brooklyn City R. R. Co., supra. That decision is, however, authority for the action based solely on a violation of the Federal statute; for, if equity would afford relief on that ground alone *after the violation,* surely a court of equity can stay the act which would constitute the violation.

Section 7 of the Sherman Act is as follows:

"Any person who shall be injured in this business or property by any other person or corporation by reason of anything forbidden or declared to be unlawful by this act may sue therefor in any Circuit Court of the United States in the District in which the defendant resides or is found, without respect to the amount in controversy, and shall recover threefold the damages sustained and the costs of suit, including a reasonable attorney's fee."

This action cannot be maintained by the minority stockholders in their own right, upon the theory that this statute would give them the right to treble damages, and that the remedy at law would be inadequate owing to the impossibility of proving the actual damages. The right of action for damages, if any, would be in the corporation, and not in the individual stockholders. It cannot be maintained that the right of action for these damages is given to the stockholders. It would be impossible to determine each stockholder's proportionate interest, and it would be an unreasonable construction to hold that every stockholder could recover treble damages, based on the entire damages sustained by the corporation. It is, however, I think, the settled rule that if the threatened act sought to be enjoined be *within the power* of the corporation, so that pending the action by the stockholder *it could be legally consummated or ratified, or if the acts have been consummated, and have thereby given rise to a cause of action in favor of the corporation for equitable relief,* as, for in-

stance, the cancellation of a contract or other instrument, then the stockholder can only sue in the right of the corporation; *but, where it is not within the power of the corporation to consummate or ratify the threatened acts, then equity will, at the instance of a minority stockholder, suing in in his own right and for the benefit of all stockholders similarly situated, grant injunctive relief.* Heath et al. v. Erie Ry. et al., 8 Blatchf. 347, 392, 393, 396, 400, 401, 406, 407, Fed. Cas. No. 6,306; Zabriskie v. C., C. & C. Rd. Co., 23 How. 381–395, 16 L. Ed. 488; Railway Co. v. Allerton, 18 Wall. 233, 21 L. Ed. 902; Gamble v. Queens County Water Co., 123 N. Y. 91, 25 N. E. 201, 9 L. R. A. 527; Kent v. Quicksilver Mining Co., 78 N. Y. 159–188; Davis v. Congregation Tephila Israel, 40 App. Div. 424, 57 N. Y. Supp. 1015, and cases cited: Currier v. N. Y., W. S. & Buffalo R. R. Co., 35 Hun, 355; Fisk v. Ch., R. I. & Pacific R. Co., 36 How. Prac. 20; Belmont v. Erie Ry. Co., 52 Barb. 637; Watson v. Harlem & New York Navigation Co., 52 How. Prac. 348; Byrne v. Schuyler Elec. F. & G. Co., 65 Conn. 336, 31 Atl. 833, 28 L. R. A. 304; Commissioners of Craven v. A. & H. C. R. Co., 77 N. C. 297; Fletcher v. Alpena Circuit Judge, 136 Mich. 511, 99 N. W. 748; Tomkinson v. Southeastern Ry. Co., L. R. 35 Ch. Div. 675; Green's Brice on Ultra Vires, 643; High on Inj. (4th Ed.) §§ 1224–1226; Langan v. Francklyn (City Ct.) 20 N. Y. Supp. 404. See, also, Colby v. Equitable Trust Co., 124 App. Div. 262, 108 N. Y. Supp. 978, affirmed 192 N. Y. 535, 84 N. E. 1111, and Mills v. Central Rd. Co., 41 N. J. Eq. 1, 2 Atl. 453.

In Tomkinson v. Southeastern Railway Co., supra, which was an action by a stockholder in his own right to enjoin an illegal disbursement of corporate funds, the court, on granting the injunction, among other things, said:

"I have no doubt that it is the duty of the court to grant an injunction in this case. The question, as the Attorney General said, is whether the act proposed to be done is within the powers of the railway company, or outside its powers. If it is outside its powers, it is now perfectly settled that any one shareholder may come to this court and say, 'This company is going to do an act which is beyond its powers; stop it;' and the court thereupon has no discretion in the matter."

If equity will, at the suit of a stockholder or member of a corporation in his own right and without showing special damages, enjoin threatened acts of the corporation which are ultra vires or otherwise illegal, I see no reason on principle why it has not jurisdiction and should not exercise jurisdiction to enjoin an illegal transfer of a majority of the stock. If an injunction would lie in such circumstances to enjoin the issue by the corporation of a controlling interest in the stock in violation of law, I think it will also lie to enjoin the illegal transfer by a stockholder of a controlling interest in the stock. The effect upon a minority stockholder of a transfer of a controlling interest in the outstanding stock in violation of law is precisely the same as if the stock had never been issued, and the corporation was threatening to consummate a contract to issue and sell a controlling interest in the stock in violation of law, in the sense

that the law prohibited its issuance to the particular purchaser. I see no distinction in this regard between a violation of the *charter* of the corporation and the violation of any other law prohibiting the act. Where the majority of the stock has been accumulated in the hands of a single stockholder for the purposes of control, and where such stockholder is a rival competing corporation, such corporation becomes for all practical purposes the corporation which it thus dominates and controls (Farmers' Loan & Trust Co. v. N. Y. & N. R. Co., 150 N. Y. 410–434, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689; U. S. v. Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663; Ervin v. Oregon Ry. & Nav. Co. [C. C.] 27 Fed. 625), and should be enjoined from committing acts ultra vires the corporate powers of the corporation, or otherwise illegal, or in violation of the duty it owes to the minority stockholders, the same as if the corporation itself were threatening to commit the acts.

The majority stockholder in the circumstances disclosed by this case, a controlling interest having been accumulated by it for the purposes of control, occupies "substantially the same relation of trust towards the minority as the board of directors would occupy toward the stockholders it represents" (see Farmers' Loan & Trust Co. v. N. Y. & N. R. Co., supra), and owes a duty to the minority stockholders to manage the corporation *within its charter powers and within all other laws applicable thereto, and in good faith and for the best interests of the corporation,* and it is within the jurisdiction of a court of equity to enjoin and redress violations of this duty; but the honest exercise of the discretion and judgment vested in the majority stockholders cannot be reviewed by the court. Gamble v. Q. Co. W. Co., supra; Farmers' Loan & Trust Co. v. N. Y. & N. R. Co., supra; Flynn v. City Rd. Co., supra; Wright v. Oroville M. Co., 40 Cal. 20; Ervin v. Oregon Ry. & Nav. Co., supra; Meyer v. Staten Island Ry. Co., 7 N. Y. St. Rep. 245.

It is not necessary to consider the federal authorities under which counsel for the appellants contends that a suit in equity to *enforce* the provisions of the Sherman Act by injunction can only be maintained by the Attorney General pursuant to the provisions of the act; for in the case at bar well-recognized grounds of equity jurisdiction appear, and the minority stockholders have the same right, in my opinion, to apply to a court of equity to enjoin acts on the part of the majority stockholder and of others, including the corporation of which they are stockholders, in violation of a federal statute, as if the acts were in excess of the powers conferred upon the corporation by its charter, or in excess of the authority of stockholders as limited by the charter or other laws of the state; for when the Congress of the United States legislated on this subject, which was clearly within its jurisdiction, it declared rules of law and of public policy which superseded all laws and rules of public policy of every state and territory inconsistent therewith, and the statute became as binding in this and every other state as if it had been enacted by the state Legislature, and it is as much the duty of the state courts to protect stockholders of a corporation against a violation thereof

as if the violation were of the charter powers of the corporation or of other statutory law of the state. See Second Employers' Liability Cases, 223 U. S. 1, 32 Sup. Ct. 169, 56 L. Ed. 327.

The authorities lastly herein cited are, I think, precedents for this action; but, if they are not, I think that a precedent therefor should be made, for it will tend to safeguard the interests of the minority stockholders by preventing those in control through ownership of the majority of the stock from violating the duty which they owe to the minority to conduct the affairs of the corporation and preserve it as a separate entity for the fulfillment of the purposes of its creation, instead of turning it over to a rival in violation of law and virtually terminating its independent existence. There is no danger in such a precedent. The only judgment demanded is an injunction to prevent the consummation of the transfer of the stock control in violation of the duty of the majority owner to the minority owners, and in violation of the federal statute. The defendants will neither be subjected to a double recovery nor to a multiplicity of actions. No recovery is sought excepting a decree of the court restraining the violation of this trust duty and of the statute and canceling the transfer of stock which has been made; and this as a representative action in behalf of all stockholders who are not selling their stock at the excessive valuation offered by the New Haven Company for sufficient only to give it control of the Rutland Company. Of course, no action could be brought by the majority holder who is selling, and it is a party defendant, and the final decree will determine all questions with respect to liability by virtue of the contract, or contemplated contract, as between it and the vendee, who is also before the court. No other minority stockholder can maintain a separate action in his own right for the relief demanded by plaintiffs, and if such an action should be brought, under well-settled rules of equity practice, it would be consolidated with this or stayed. I regard it as exceedingly doubtful whether the Rutland Company could maintain an action for like relief; but, however that may be, it has been made a party defendant, and the other defendants will not be prejudiced, for the Rutland Company will be bound by the decree, and could not, if it would, maintain another action for like relief.

Section 150 of the Railroad Law (chapter 49, Consol. Laws; chapter 481, Laws 1910) forbids the merging or consolidation of parallel and competing lines of railroad, other than street surface railroads, and contracts, including leases, for the use of one road by the other, "unless the Public Service Commission shall consent thereto"; and section 54 of the Public Service Commission Law (chapter 48, Consol. Laws; chapter 480, Laws 1910) forbids the purchase or acquisition by *any* railroad corporation, domestic or foreign, of "any part of the capital stock of any domestic railroad corporation," including street surface railroads and other common carriers, " oganized or existing under or by the laws of this state, unless authorized so to do" by the Public Service Commission. The consent and authorization by the Public Service Commission pursuant to these provisions of law was obtained. The learned counsel for the appellants contends, therefore,

that the transfer, having been authorized by the laws of our state, cannot contravene any public policy which it is the duty of or within the jurisdiction of this court to enforce.

That argument seems plausible, but it is fallacious. It leaves out of consideration the fact that the Congress of the United States has exercised its constitutional authority to declare by statutory enactment a public policy on the same subject for the whole country, which, by virtue of the express provisions of the federal Constitution, became the "supreme law of the land," and is as much the public policy of this state as any statute enacted at Albany. The federal statute superseded all state statutes inconsistent therewith, and rendered nugatory any subsequent state legislation in conflict therewith. Second Employers' Liability Cases, supra. It is based on the further erroneous theory that the Public Service Commission of the state of New York, in approving this transfer of stock, *authoritatively* determined that the transfer would not be prejudicial to the public interests, or in restraint of trade, or constitute a violation of the Sherman Act, and that such determination, if not controlling, should be accepted by this court. The *opinions* of the Public Service Commissioners, acting within their jurisdiction, are entitled to great weight, and doubtless their *determinations* on facts, acting likewise within their jurisdiction, if not annulled on certiorari, are controlling; but the Commission was exercising functions under the state law, and it could make no adjudication which would protect any of the parties against a prosecution or action for a violation of the Sherman Act, or which would constitute a bar to an action for damages or a suit in equity based on a violation thereof, or on a breach of the duty owing by the majority stockholders to the minority stockholders. If the transfer would constitute a violation of the Sherman Act or of such duty the Public Service Commission should not have approved it; but that body was not given jurisdiction to authoritatively decide those questions. It was authorized merely to determine authoritatively whether or not the transfer would be consistent with *public* interest, and, if so, to consent in behalf of the people of this state. That consent or approval was at most merely permissive, and notwithstanding it a court of equity may inquire into the motive of the Central Company in selling and the purpose and object of the New Haven Company in thus acquiring control of the Rutland Company, and the effect thereof, even though no statute were violated thereby; and if the transfer involves a breach of duty on the part of the vendor, it being in the circumstances of a quasi trustee for the minority stockholder, I think that it is entirely competent for a court of equity to enjoin it. See Farmers' Loan & Trust Co. v. N. Y. & N. R., supra, 150 N. Y. 434, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689; Young v. R. & K. G. L. Co. et al., 129 N. Y. 57, 29 N. E. 83; Colby v. Equitable Trust Co., supra.

Moreover, I am of opinion that it is by no means clear that the Legislature contemplated that the Public Service Commission would attempt to approve of the purchase *of a mere controlling interest* in the stock of one corporation by a rival competing line, thus leaving

the minority stockholders at the mercy of a management directly opposed to them in interests. Such a situation might, if it were not a violation of the Sherman Act, warrant consolidation, but not the transfer of mere stock control. The approval of the Commission appears to have been largely influenced by its view that the control of the Rutland Company by the New Haven Company would be less detrimental to the minority stockholders of the Rutland Company than if such control remained in the Central Company, which the Commission held was a parallel and competing line, where it has been for many years, and would be more beneficial to the public; and the Commission assigned this as a reason for not requiring the New Haven Company to offer to purchase the minority stock on the same terms as it had agreed to purchase the majority stock, which the Commission, on denying an application of the New Haven Company for leave to sell its stock in the New York, Ontario & Western Company to the Central Company, ruled would be a proper condition to impose on granting such an application, for the reason that the minority stockholders could not be protected in such case by the courts or otherwise. Some of the stockholders of the Rutland Company have an action pending against the Central Company to prevent its control over the Rutland Company through ownership of the majority of the capital stock. The right of the plaintiffs to enjoin this transfer cannot be affected by the failure thus far of certain stockholders of the Rutland Company, as plaintiffs in the other action against the Central Company, to succeed.

The Court of Appeals in Young v. Rondout & Kingston Gaslight Co., 129 N. Y. 57–60, 29 N. E. 83, 84, on considering whether an injunction, *which was essential to a recovery by the plaintiffs,* should be vacated, said:

"To dissolve an injunction, with the inevitable result of defeating plaintiff's remedy without a trial, we must be entirely satisfied that the case is one in which by settled adjudication the plaintiff, upon the facts stated, is not entitled to final relief. We cannot say that of this plaintiff's complaint in advance of a trial. * * * These are grave and serious questions. On this motion we do not decide them."

It may be said that on the review of the order the Court of Appeals was confined to legal questions, and that this court may review the exercise of discretion by the court at Special Term; but still, if the plaintiffs present a prima facie case for injunctive relief, where, as here, it is probable that their right to final judgment will depend upon whether the status quo is maintained, I am of opinion that the injunction order should be sustained. See Mannington v. Hocking Valley R. R. Co. (C. C.) 183 Fed. 133, 146, 147, 149, 159; Bigelow v. Calumet & Heckla Mining Co. (C. C.) 155 Fed. 869.

On the hearing on the application to vacate the injunction order, which was originally granted ex parte, the plaintiffs offered to have the cause submitted for decision on the merits on affidavits presented on the motion, as depositions, or to try the issues immediately, and they subsequently formally renewed this offer in writing. That was some evidence that the action has not been brought in bad faith and

for the purpose of delaying the transfer of the stock. I am of opinion that the plaintiffs have in the circumstances sufficient basis for their contention that the transfer of this stock constitutes a violation of the Sherman Act and a fraud upon the corporation and its minority stockholders to warrant the temporary injunction order until a decision of the action on the merits, which, if the defendants had been willing to proceed to trial, doubtless could have been had long ago. In view of the right which a railroad corporation now has for the exchange of freight and passenger traffic with connecting lines under the Interstate Commerce Act (section 12 of chapter 309 of Session 2 of 61st Congress [Act June 18, 1910, 36 Stat. 551] amending section 15 of "An act to regulate commerce," approved February 4, 1887 [Act Feb. 4, 1887, c. 104, 24 Stat. 384 (U. S. Comp. St. Supp. 1911, p. 1301)]), the efforts of the New Haven Company to obtain a controlling interest in the Rutland Company indicate that it is not actuated by a desire to further the interests of the Rutland Company, and the contrary is clearly shown by the exorbitant price paid for the stock and the admissions of President Mellen of the New Haven Company. It is presumptively, I think, against the interests of one corporation to have it controlled by a competitor. Louisville & Nashville v. Kentucky, 161 U. S. 677, 16 Sup. Ct. 714, 40 L. Ed. 849.

The appellants further contend that in the main the Rutland and New Haven Companies are connecting companies, and form a through line, and are parallel and competing only to a very small extent, and that therefore there is and will be no violation of the Sherman Act, which was construed by the Supreme Court of the United States in U. S. v. American Tobacco Co., supra, as embracing only "acts or contracts or agreements or combinations which operated to the prejudice of the public interests by unduly restricting competition or unduly obstructing the due course of trade, or which either because of their inherent nature or effect or because of the evident purpose of the acts" injuriously restrain trade. Those questions should be left for decision when the facts are fully developed by common-law proof showing definitely the extent to which the lines are competing and parallel, and the extent to which trade and commerce will be restrained and a monopoly created, and clearly laying bare the purpose of the majority stockholder of the Rutland Company in thus turning over the control and management of that company to the New Haven Company and of the latter company in acquiring it. The plaintiffs allege, and present evidence tending to show, that the New Haven Company and lines which it controls are competing and parallel lines with the Rutland line to an extent sufficient under the decisions of the federal courts construing the Sherman Act to establish presumptively that the proposed transfer constitutes a contract or combination in restraint of interstate and foreign trade and commerce, and is designed to monopolize such trade and commerce, and that it is therefore illegal and void. See Louisville & Nashville v. Kentucky, supra; Northern Securities Co. v. U. S., 193 U. S. 197, 24 Sup. Ct. 436, 48 L. Ed. 679; Standard Oil Co. v. U. S., 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834; U. S. v. American Tobacco Co., supra; Harriman v. Northern Securities Co., 197 U. S. 244, 25 Sup. Ct. 493, 49 L.

Ed. 739; Pearsall v. Great Northern Ry. Co., 161 U. S. 646, 16 Sup. Ct. 705, 40 L. Ed. 838; Langdon v. Branch (C. C.) 37 Fed. 449, 2 L. R. A. 120. See, also, State ex rel. Attorney General v. Hocking Valley, 12 Ch. Circuit (N. S. L.) 49; Hafer v. Cinn., H. & D. R. Co., 29 Ch. L. J. 68; Gulf, C. & S. F. R. Co. v. State, 72 Tex. 404, 10 S. W. 81, 1 L. R. A. 849, 13 Am. St. Rep. 815; People v. Boston, H. & T. R. Co., 12 Abb. N. C. 230. And, therefore, without intending to express an opinion on the merits, as they may be developed on the trial, I think that the plaintiffs are entitled to have the injunction continued.

I therefore dissent from the reversal of the order.

MILLER, J. I am of the opinion that a minority stockholder of a corporation may maintain an action to enjoin the transfer of the control of the corporation to a competing corporation in violation of law, and that the plaintiffs have made a sufficient case on that head to justify the Special Term in preserving the status quo until the determination of the action.

I therefore vote to affirm the order.