denying defendants' motion must be reversed, with costs, and the motion to vacate granted, with $10 costs of motion.

Order reversed, with $10 costs and disbursements, and motion to vacate granted, with $10 costs. All concur.

---

(98 App. Div. 29.)

### WORMSER v. METROPOLITAN ST. RY. CO.

(Supreme Court, Appellate Division, First Department. November 18, 1904.)

1. CORPORATIONS—RIGHTS OF STOCKHOLDERS—ESTOPPEL.

Where a plan for the leasing of all the property of one corporation to another allowed the stockholders of the lessor to participate in the anticipated profits by subscribing to the stock of a third corporation, the value of whose stock depended wholly on the validity of the lease, a stockholder of the lessor, who had sold his right to subscribe to the stock of the third corporation, could not object to the validity of the lease.

2. SAME—FACTS ARISING AFTER COMMENCEMENT OF SUIT.

Acts of plaintiff after the commencement of a suit may preclude him from maintaining it, and be pleaded by the answer for that purpose.

3. RAILROADS—LEASE.

Under Railroad Law, § 78 (Laws 1890, p. 1106, c. 565), providing that any railroad company may contract with any other for the use of their respective roads, etc., a railroad may lease its property for 999 years.

Appeal from Special Term, New York County.

Action by Isidor Wormser, Jr., against the Metropolitan Street Railway Company. From a judgment for defendant, plaintiff appeals. Affirmed.

The plaintiff, a stockholder of the Metropolitan Street Railroad Company, sought to set aside or to prevent the delivery of a lease dated February 14, 1902, executed by the Metropolitan Street Railway Company, as lessor, and the Interurban Street Railway Company, as lessee. He also asked for an injunction to restrain the defendants from carrying out the provisions of a plan presented to the stockholders of the Metropolitan Street Railway Company by its directors, relating to a method of providing money to pay the unfunded debts of that corporation, and to defray the expense of extending its electrical system to upwards of 80 miles of its lines, on which that system was not then used. The basis of the plan was the lease referred to. At a meeting of the directors of the Metropolitan Street Railway Company, the project of making the lease was assented to, subject to the approval of the stockholders. At meetings of the stockholders of the Metropolitan Street Railway Company, the scheme of making the lease and of adopting the plan was assented to by a large majority of such stockholders, and subsequently 99 per cent. of all the stockholders (including those who voted at the meeting) acquiesced in the arrangements that were made. The lease was for a term of 999 years, the lessee agreeing to pay as rental an amount equal to 7 per cent. of the capital stock of the Metropolitan Street Railway Company. It also provided that the lessee should pay to the Metropolitan Street Railway Company $23,000,000 in cash, which was the amount of its floating debt, and of money required to provide for construction and other legitimate obligations of the Metropolitan Street Railway Company. The lessee was also to receive certain securities of the Metropolitan Street Railway Company, amounting in actual value to about the same sum. By the plan the stockholders of the Metropolitan Street Railway Company were also to have the privilege of subscribing to the capital stock of the Metropolitan Securities Company, which was a corporation organized under the laws of the state of New York, and which owned, actually

---

¶ 2. See Action, vol. 1, Cent. Dig. § 736.

or potentially, the entire capital stock of the Interurban Company. After the action was brought, but before answer, the plaintiff elected to participate in the privilege of buying or subscribing to stock of the Metropolitan Securities Company, so far as related to 885 of his 1,000 shares of stock, and he received a large sum of money upon a sale of that privilege. The substantial grounds upon which the plaintiff assailed the transaction were: First, that the Metropolitan Street Railway Company had not the legal right or authority to execute the instrument called a "lease"; that that instrument, when considered in connection with the material facts appearing in the case, was not in reality a lease, but was an absolute conveyance of all the property, rights, and franchises of the Metropolitan Street Railway Company to another corporation; and, second, that, whatever might be the legal character of that instrument, it was in fact fraudulent as against the minority stockholders of the Metropolitan Street Railway Company, of whom the plaintiff was one, and that the lease and the plan were merely parts or steps in an illegitimate scheme to divert the property of the Metropolitan Street Railway Company from the stockholders of that corporation to other persons, to the great detriment and wrong of such stockholders. On the trial at Special Term the court dismissed the complaint on the merits, holding that the Metropolitan Street Railway Company had the legal right and power to make the lease, with the assent of the stockholders, and that the transactions, so far as related to the lease and to the plan, were entered into and consummated honestly and in good faith, and without any fraud on the part of any of the participants therein.

Argued before VAN BRUNT, P. J., and HATCH, McLAUGHLIN, PATTERSON, and O'BRIEN, JJ.

Albert Stickney, for appellant.
Paul D. Cravath and Charles F. Brown, for respondents.

PATTERSON, J. The plaintiff appeals from a judgment dismissing the complaint on the merits. He brought the action as a stockholder of the Metropolitan Street Railway Company, suing for himself and on behalf of all stockholders of that company, to set aside or to prevent the delivery of a lease executed by it to the Interurban Street Railway Company under the claimed authority of section 78 of the railroad law of the state of New York (Laws 1890, p. 1106, c. 565). In addition to that relief, he prayed that the defendants be restrained from carrying into effect the provisions of a certain plan which related to arrangements between the Metropolitan Street Railway Company and its stockholders and other parties, but the substantial basis of which plan is the lease referred to.

It should be stated at the outset that, as the case now comes before us, the individual interests of the plaintiff alone are concerned; that no other stockholder of the Metropolitan Street Railway Company has united with the plaintiff in this action; and that therefore, so far as the present suit is concerned, it must proceed upon the special right of the plaintiff to maintain the action.

At the threshold an obstacle to the assertion of that right is presented. At the time of the commencement of the suit the plaintiff owned a thousand shares of the stock of the Metropolitan Street Railway Company. The plan to which reference has been made, and which he seeks to have declared illegal and in violation of his rights as a stockholder, included a privilege of stockholders of the Metropolitan Street Railway Company to share in the bene-

fits of that plan by subscribing to stock of another corporation, the whole value of which stock rests upon the validity of the lease which the plaintiff is seeking to avoid. Before answer was interposed the plaintiff sold his right to subscribe, so far as it was associated with 885 of his shares of the Metropolitan Street Railway Company's stock, and he received in money between $5,000 and $6,000 upon a sale of his privilege. He thus bound himself to the whole scheme which he now seeks to repudiate. It is true that he notified the Metropolitan Street Railway Company that his exercise of the privilege was without prejudice to his asserted rights with respect to the subject-matter of this present suit, but that cannot avail him. It would be a fraud upon the purchaser of stock acquired through the exercise by the plaintiff of the privilege to set aside, at his instigation, the transaction out of which arises the value, according to the plaintiff's own showing, of the new stock. The objection that the plaintiff is precluded from now insisting upon the invalidity or irregularity of any of the acts he complains of is open to the defendants, and they have set it up in their answer. "It is a familiar rule in equity cases which permits courts to take into consideration subsequent events, happening after the commencement of the action in equity, and determining what relief shall be granted, especially where part of the relief asked for is an injunction from the court to restrain parties." Mann v. City of Utica, 44 How. Prac. 339, citing Lyon v. Brooks, 2 Edw. Ch. 110. A defendant may set up in his answer matter which has occurred between the filing of the bill and the putting in of such answer. Earl of Leicester v. Perry, 1 Brown, Ch. 305; Turner v. Robinson, 1 Sim. & S. 3; Barbour's Chancery Practice, vol. 1, p. 141. In Lyon v. Brooks, 2 Edw. Ch. 110, exceptions taken to the answer related to an agreement and payment set forth in the answer, and which had occurred subsequent to the filing of the bill. The Vice Chancellor said:

"If there were any rule of equity pleading by which a defendant is precluded from availing himself of matters arising between the filing of the bill and the answer, by way of avoidance or defense, there might be some ground for these exceptions. But there is not, and it certainly cannot be said that the matters set up are foreign to the case."

We think the learned court at Special Term might well have disposed of this case at the trial by determining that the plaintiff had put himself in such relation to the subject-matter of the transactions that it would be grossly inequitable to allow him, in his own interest only, to maintain a suit to undo that out of which he had manifestly made a large profit. He should not be permitted to use his cause of action for purposes of speculation by splitting up his right, and disposing of part of it in such a way as to bind him to the transactions he complains of, and retaining another part to enable him to repudiate those transactions. The court at Special Term, while suggesting that view, was not controlled by it, but went into a consideration of the whole case in its legal aspect and upon its merits. We have also examined this record with very great care, and with the result that we can see no reason whatever

for reversing the judgment appealed from.  The allegations of the complaint present a formidable case against the defendants, and, if they had been established by proof in a properly constituted action, we should have been strongly inclined to afford relief, even if it required the disturbance and unsettlement at this late day of arrangements and relations which have, by lapse of time, become exceedingly complicated.  The rights of minority stockholders are to be protected by the courts.  There are many instances in the books in which those rights have been enforced, such as the Farmers' Loan & Trust Co. v. N. Y. & N. R. Co., 150 N. Y. 410, 44 N. E. 1043, 34 L. R. A. 76, 55 Am. St. Rep. 689, and Flynn v. Brooklyn City R. Co., 158 N. Y. 493, 53 N. E. 520.  The last-cited case is relied upon by the learned counsel for the appellant, and it is claimed to be on all fours with the one at bar.  In that case, however, the allegations of the complaint were substantially admitted. Here they are not only not admitted and not proven, but they are substantially disproven.

It becomes proper at this point to refer to some material facts, and to the grounds upon which the plaintiff seeks relief; and that necessarily involves, also, an inquiry into the authority of the defendants to do those acts of which the plaintiff complains, and the good faith and honesty with which they were done, if the legal right to do them existed.

The Metropolitan Street Railway Company operated a very extensive system of street railways in the city of New York.  The Interurban Street Railway Company was a corporation of the state of New York which owned and operated a line of railway in Westchester county, and owned or controlled certain franchises or rights to construct or operate street railways in some 50 or 60 miles of streets in the borough of the Bronx.  On or about the 14th of February, 1902, the Metropolitan Street Railway Company leased to the Interurban Street Railway Company its lines of railway, and entered into certain arrangements with it pursuant to a plan by which the property of the lessor corporation was turned over to the Interurban Street Railway Company in consideration of that company agreeing to pay annual rental at an amount equal to 7 per cent. of the capital stock of the Metropolitan Street Railway Company, and also agreeing to provide it with $23,000,000 for the purpose of extending, improving, and equipping the Metropolitan Street Railway system, and of various other considerations not necessary to be stated in detail now.  It was also provided that the lessor "sold to the lessee" stocks and bonds then held by the former of very large value, and also claims which it had against its dependent or subsidiary companies for moneys advanced or expended for them in equipping or improving the property of such companies. The plan which was adopted and acted upon, among other things, had regard to the creation of a third corporation, known as the Metropolitan Securities Company, which was to issue stock to the amount of $30,000,000, and to furnish to the Interurban Street Railway Company the money required to be paid to the Metropolitan Street Railway Company, all of which stock was subscribed for and guarantied at par by Messrs. Kuhn, Loeb & Co., bankers, of the city of New York; such subscription

and guaranty being conditioned upon the approval of the lease by the stockholders of the Metropolitan Street Railway Company prior to May 1, 1902; and the Securities Company was to acquire all the outstanding capital stock and the other securities of the Metropolitan Street Railway Company. Syndicates were organized for the purpose of taking the stock and bonds of the new corporations, and guarantying the payment of the capital of the Securities Company, and somewhat complicated relations were established between the various corporations. Without going further into the detail of these matters and arrangements, it suffices to say that the plaintiff attacks the lease and plan on several grounds, which are really reducible to two: The first is that all of the transactions, from beginning to end, were illegal; and, second, that those transactions constituted a fraudulent scheme to divert the property of the Metropolitan Street Railway Company from that corporation, and to transfer it to another corporation in such a way as to enable those who were manipulating the scheme to realize immense sums of money to the great prejudice of the interests of the stockholders of the Metropolitan Street Railway Company who did not approve of or participate in the transactions.

It is not to be controverted that the lease made by the Metropolitan Street Railway Company to the Interurban Street Railway Company was authorized, and was executed in due conformity with the requirements of law. A special meeting of the board of directors of the Metropolitan Street Railway Company was held at the office of that defendant, and there and then the directors, subject to the subsequent approval of the stockholders of the company, approved the lease and contract, and authorized the president and secretary to execute the same on behalf of the company; and it was directed that a stockholders' meeting be called for the 20th of March, 1902, for the purpose of voting upon the approval of the lease and contract; and, if the same were approved, the officers of the corporation were authorized and directed to execute the certificate required by law, and to file the lease and contract in the proper public office. The project of making the lease was duly submitted to the stockholders of the Metropolitan Street Railway Company at a meeting lawfully and regularly called upon sufficient notice, stating the purpose of calling it, and the subject which would then be presented to the stockholders for consideration, and the lease and contract were read at that meeting. The scheme of leasing the road met with the approval of the vast majority of the stockholders voting by shares. There is much criticism made of the manner in which that meeting was conducted, as indicating a purpose and intent of some of the principal stockholders, including the presiding officer of the meeting, to prevent a full discussion of the subject by minority shareholders, who were interested in defeating the project. We are not able to perceive that anything done or said at that meeting was of such a character as to require the court to set aside the clearly expressed will of the majority of the owners of stock. There can be no doubt that substantially all of the stockholders were in favor of the lease and the plan, which is apparent from the fact that over 99 per cent. of all the shareholders of the Metropolitan Street Railway Company either assented to the lease at the stockholders' meeting, or subsequently ratified it by accept-

ing the privilege of subscribing to shares of the Metropolitan Securities Company.

The fundamental consideration in the case is the power of the Metropolitan Street Railway Company to make this lease. That power is challenged by the plaintiff, who claims, in a very ingenious and plausible argument, that the instrument which is denominated a "lease" is something more than that, and that it is an absolute conveyance of everything the Metropolitan Street Railway Company owned to the Interurban Company, under the guise of a lease, and that it is tantamount to a practical surrender of the franchises and corporate powers of the Metropolitan Street Railway Company. This aspect of the case, very forcibly presented, requires a consideration of the circumstances and conditions under which the lease was executed. So far as the instrument itself is concerned, and regarding it merely as a lease by one railroad company to another, whatever may have been antecedent views concerning that subject, it is now established that under the Acts of 1839, p. 195, c. 218, and hence under section 78 of the railroad law, the powers thereby granted to railroad corporations extend to and include the power to lease. There is very little difference in the phraseology of the act of 1839 and that of section 78 of the present railroad law. By both it is enacted that any railroad corporation, or any corporation owning or operating any railroad or railroad route within the state, may contract with any other such corporation for the use of their respective road or roads, or any part thereof; such use not to be inconsistent with the provisions of law applicable to its use by the corporation owning the same at the time of the execution of the contract. It is well known that under the act of 1839 it was strongly contended that no larger or greater interpretation could be given to the permission thereby conferred than that running arrangements might be made by one railroad corporation with another. But it was held, as the proper interpretation of that statute, that it permitted the leasing of one railroad to another, which contemplated the virtual abandonment of everything connected with the lessor road and the vesting of it in the lessee, as is pointed out by Judge Van Brunt in his opinion in the Manhattan Railway Case, 14 Abb. N. C. 201. See, also, Beveridge v. N. Y. E. R. Co., 112 N. Y. 21, 19 N. E. 489, 2 L. R. A. 648; Woodruff v. Erie Railroad Co., 93 N. Y. 616; Ingersoll v. Nassau Electric R. Co., 157 N. Y. 453, 52 N. E. 545, 43 L. R. A. 236.

Considering the subject now before us merely in the light of the legal character of the lease, we can see no objection to its validity, although it be for a long term of years. But it might be assailable if it were established that the execution of that lease were merely a step in the consummation or perpetration of a fraud upon the stockholders of the lessor company. We have fully considered the evidence of the circumstances under which the lease was made, and the subsequent arrangements between the various corporations entered into. If it were shown that there was no reason for the Metropolitan Street Railway Company directors to approve and recommend the plan, and that it was one by which the virtual ownership and administration of that road were turned over to others than its stockholders, and in fraud of the rights of such stockholders, there would be no doubt of the aid of the court

being extended to a properly qualified plaintiff to prevent the commission of a great wrong. Here the inquiry relates to the good faith of the whole transaction. On that subject it is well to say that, upon a critical examination of this record, we do not find that any person con-- nected with the management of the Metropolitan Street Railway Company, either as an officer or director, or as an influential stockholder, secured to himself, out of the new corporate relations when they were established, any personal advantage which was not open to every other stockholder of that company. We have sought in vain through the record to find anything to impeach the honesty and good faith of any person connected with the initiation or consummation of the transactions by which the Interurban Street Railway Company became lessee. We are not now considering the wisdom of the scheme adopted. It may have been judicious, or it may not have been. The simple question is whether what was done was wanton and for the benefit of those who were the instigators of or participants in the plan, or whether it was something adopted in good faith and in the belief that it would be for the benefit of all the holders of stock of the Metropolitan Street Railway Company.

Certain considerations stand out prominently, and they are that, immediately preceding the negotiations for leasing the lines of the Metropolitan Street Railway Company, the affairs of that corporation were in embarrassment, and it was necessary that some plan should be devised to relieve the situation. It further appears that the stockholders of that road had received annual dividends of 7 per cent. upon their shares, and it was desirable that some plan should be devised by which the obligations of the road should be met, necessary funds for extension, addition, and further equipment supplied, and at the same time provision be made for the maintenance of the dividends at the accustomed rate. Further than all that, several gentlemen of great prominence and experience, whose time and efforts had been given largely to the affairs of the Metropolitan Street Railway Company, were, by reason of other matters demanding their attention, obliged to withdraw from active participation in the business of that company. The situation, and what was done to remedy it, is stated with remarkable clearness in the testimony of Mr. William C. Whitney. There is nothing in the record which contradicts any fact to which he testified, nor which in the slightest degree varies his statement. After referring to the retirement from active management as directors or advisers with the president of the company, of the important gentlemen referred to, he proceeds to say that the corporation had gone into heavy debt; that the requirements for the future were large, and when the proposition was fairly put, of how to finance the Metropolitan Street Railway Company, it could not be treated as a financial question only. It had to be treated as a question that required the accession of strong men to the corporation—the bringing in of new men to support it, and management of its property. It was not only a question with regard to a guaranty of 7 per cent. upon the capital of the company's stock, but the bringing in of a set of men who were strong enough in New York, and important and powerful enough, to stand by the president of the corporation in his effort to maintain the prosperity of the company. From the testi-

mony of Mr. Whitney and that of other witnesses, it is beyond doubt that the affairs of the Metropolitan Street Railway Company were in such a condition that some new arrangement had to be made in the interest of its stockholders. Negotiations looking to this end were begun with the firm of Kuhn, Loeb & Co., and, after much time and effort and struggle, they eventuated in the lease and the contract and the plan which have been the subject of consideration in this action. In all those negotiations the persons who were representing the interest of the Metropolitan Street Railway Company stockholders were dealing at arm's length with Mr. Jacob Schiff, who represented the firm of Kuhn, Loeb & Co. As said before, we are unable to find in the whole of this record anything which impeaches the honesty, the good faith, the fairness, or the loyalty of those who acted for the Metropolitan Street Railway Company and its stockholders in this transaction. Therefore, finding, as we do, as matter of law, that the Metropolitan Street Railway Company had the power and the capacity to make the lease, and, as matter of fact, that it was authorized by the stockholders, and that there was no fraud or wrong perpetrated upon such stockholders of the Metropolitan Street Railway Company by any persons standing in the relation to them of trustees, or in any fiduciary relation, but that the acts, whether prudent or imprudent, of such persons, were performed in perfect good faith, we concur with the court at Special Term that the plaintiff was not entitled to the relief demanded, and hence that the complaint was properly dismissed.

The judgment should be affirmed, with costs. All concur.