WESTCHESTER FIRE INSURANCE COMPANY, Plaintiff, v. SYRACUSE, BINGHAMTON AND NEW YORK RAILROAD COMPANY and Others, Defendants.

(Supreme Court, New York Special Term, November, 1916.)

Corporations — lease by directors — whether unfair and oppressive to minority stockholders.
Public Service Commissions Law, § 55 — when approval of railroad lease not res adjudicata of stockholders' rights — minority stockholder of lessor accepting extra dividend — lease held unfair — function of public service commission..

The only question that survives the approval, by the majority of the stockholders of a corporation, of the action of its board of directors making a certain lease of its properties is whether such action has been so plainly unfair and oppressive of the minority stockholders that the court should interfere for their protection.

The determination of the public service commission by which a lease from one railroad company to another was authorized, over the objection of a minority stockholder of the lessor, is not *res adjudicata* of its rights since the public service commission was constituted to protect the rights of the public not the rights of stockholders between themselves, said commission having no jurisdiction to conclude the stockholders as to their rights *inter se.*

That the minority stockholder at the making of the lease received an extra dividend which was not paid under or pursuant to any terms of the lease, the making of which had nothing to do with the creation of the fund out of which said dividend was paid, did not estop the minority stockholder from objecting to the lease.

By a lease of the property of one railroad company to another which held a majority of its stock, the membership of the board of directors in both corporations being substantially identical, the lessor was required on the request of the lessee to issue bonds or stock in such amount as it might require for various puposes set forth in the lease, including such extensions, branches or even other railroads as it might see fit to build. The lessee was not bound by anything in the lease or by the approval thereof by the public service commission to pay or guarantee payment of either principal or interest of new bonds issued by the lessor. Held, that the lease was plainly so unfair and oppressive of the rights of a minority stockholder of the lessor that the court will interfere for its protection and that it was not for said stockholder to show that every one of the alternate courses permitted by the lease would result disastrously to the lessor.

Though section 55 of the Public Service Commissions Law regulates the issuance of stock, bonds and other forms of indebtedness of common carriers, railroad corporations and street railroad corporations which are payable at periods of more than twelve months after the date thereof, minority stockholders need not rely for protection of their interests on the public service commission, in case of threatened illegal action by the corporation.

The nature of the action and the facts, so far as they are material, are stated in the opinion.

Frank M. Tichenor (Benjamin G. Paskus, George H. Taylor, Jr., and Jacob Scholer, of counsel), for plaintiff.

F. W. Thomson and W. S. Jenney (A. J. McMahon, of counsel), for defendants The Syracuse, Binghamton and New York Railroad Company and the Delaware, Lackawanna and Western Railroad Company.

Roelker, Bailey & Stiger (Theodore L. Bailey and Read Lewis, of counsel), for defendants Honor B. Douglas and Gillian W. B. Bailey, as executors and trustees of the estate of William R. Barr.

Stewart & Shearer, for defendants United States Trust Company, as guardian of Mary M. McLeod Cameron and the United States Trust Company of New York, as trustee of the last will and testament of Lawrence Turner, deceased.

Giegerich, J.  The plaintiff, the owner and holder of 500 shares of the capital stock of the defendant Syracuse, Binghamton and New York Railroad Company (hereinafter called the Syracuse Company), brings this action to set aside a certain lease dated October 1, 1912, between that company and the defendant Delaware, Lackawanna and Western Railroad Company (hereinafter called the Lackawanna Company), and to have the said lease declared null and void and to compel an accounting by the Lackawanna Company.  The Syracuse Company, whose railroad runs between the cities of Syracuse and Binghamton, was originally organized on July 2, 1851, under the General Railroad Law as the Syracuse and Binghamton Railroad Company.  The Syracuse and Binghamton Railroad Company was subsequently reorganized after a sale under foreclosure of its property, in 1856, under the name of the Syracuse and Southern Railroad Company, and the name of the Syracuse and Southern Railroad Company was thereafter changed to the Syracuse, Binghamton and New York Railroad Company by a special act of the legislature of the state in 1857.  Laws of 1857, chap. 214.  The total authorized capital stock of the Syracuse Company is $2,500,000, consisting of 25,000 shares of the par value of $100 each, all of which stock is issued and outstanding.  It has no funded debt.  In 1858 an agreement was entered into between the Syracuse Company and the Lackawanna Company by which the latter company was given trackage rights for the carriage of

its coal over the Syracuse road. This traffic has ever since formed a large part of the business of the Syracuse road. The compensation to the Syracuse road under this agreement was one cent per ton per mile. On December 22, 1873, the Lackawanna Company acquired by purchase 13,268 shares of the capital stock of the Syracuse Company, thus giving the former company stock control of the latter. Since that time the Syracuse road has been operated as a part of the Lackawanna system. In 1878, by agreement between the two companies, the agreement of 1858 was modified and the rate of compensation for the trackage rights for coal over the Syracuse road was reduced from one cent to one-half cent per ton per mile, at which figure it remained until the execution in 1912 of the lease here complained of. Under the agreement as modified in 1878 the Syracuse road greatly prospered and it was able out of its earnings not only to pay dividends from 1902 to 1911, inclusive, first at the rate of eight, then at nine and then at ten per cent per annum, but to pay off a funded debt of nearly $2,000,000 and to accumulate a cash surplus of over three-quarters of a million dollars — being more than thirty per cent of the par value of its stock. For the ten years prior to 1912 its net earnings averaged over sixteen per cent. For the four years immediately prior to 1912 they averaged over twenty-three per cent. After securing a majority of the stock of the Syracuse road in 1873 the Lackawanna Company continued to acquire the outstanding stock until, at the time of its annual meeting on December 6, 1911, when the lease complained of was voted upon, it owned 20,808 shares out of the 25,000 shares issued. Since that time it has purchased 744 additional shares. In consequence of the so-called Hepburn amendment of the Interstate Commerce Act the agreement of 1858 between the

Lackawanna Company and the Syracuse Company, by which the former company bound itself to furnish its coal for transportation over the latter company's road, became illegal, and in October, 1912, the agreement now sought to be set aside was entered into, with the intention of readjusting the relations of the two roads so as that they should be consistent with the policy of the new act. The Lackawanna Company abandoned the production of coal and, being unable to further perform the old agreement with the Syracuse Company, now become unlawful, it became necessary to make other arrangements for the carriage of such coal as the Lackawanna Company might engage in transporting over the tracks of the Syracuse Company. One way of accomplishing the desired result would have been by purchasing all the remaining minority stock, for which purchase permission had been granted by the public service commission of the second district on August 19, 1907. The permission so given was availed of to some extent, but, the Lackawanna Company being unable to procure the remaining stock at a price which it was willing to pay, the lease of October 1, 1912, was devised as a solution of the difficulty. By that lease the Syracuse Company granted and demised to the Lackawanna Company the railroad and all the property, real and personal, appurtenant thereto owned by the lessor, and all the franchises, powers and privileges belonging to the lessor, for the full term of the corporate existence of the lessor and all renewals thereof. The lessor also assigned to the lessee all contracts, agreements, credits and accounts which had been made by or belonged to the lessor. The lessee covenanted to assume and pay all the then existing debts and obligations of the lessor that might fall due, and all taxes and assessments imposed during its possession and enjoyment

of the demised property, and during its said enjoy-
ment under the lease to pay to the holders of the capi-
tal stock of the lessor interest at the rate of twelve
per cent per annum upon the par value of their stock.
The lessor further agreed to maintain its corporate
organization and, at the request of the lessee, to issue
bonds, other obligations or stock or part bonds, part
obligations and part stock in such amount and to such
extent as may be required by the lessee for the con-
struction and purchase of locomotives, machinery,
cars and other equipment, buildings and structures,
and for the building of any extensions or branches or
additional tracks or other railroads which the lessee
might desire to have constructed, and for the enlarge-
ment, increase or reconstruction of the railroad and
its structures, equipment and facilities, and for all
other works the cost of which is properly chargeable
to construction account. The lessor also agreed, upon
the request of the lessee, to issue such other bonds,
obligations and securities as may be required from
time to time to retire, refund, pay or discharge or
replace the bonds or other obligations theretofore
issued as the same shall mature and become payable
to the principal. The lessee agreed to maintain the
roadbed, tracks and property demised in good condi-
tion and repair at its own expense and, at the ter-
mination of the lease, to deliver up all the property
demised, and that might be constructed or acquired,
to the lessor, to be in as good order as at the execution
of the lease. It was also provided that all moneys,
bills receivable, bonds executed and not sold, unissued
stock and other assets of the lessor should be deliv-
ered to the lessee to be by it used in the payment of
debts and liabilities of the lessor. It was also further
provided that if the lessee neglected for a period of
six months to make any payments of interest upon the

mortgage bonds of the lessor, or interest at the rate
of twelve per cent per annum on the capital stock, as
provided in said lease, then the lessor might, at its
option, within ninety days after such default, but not
afterwards, treat the lease as at an end and take back
its property, and that such repossession by the lessor
should not vitiate or discharge any legal claim it
might have against the lessee by reason of any breach
of the lease accruing at or before the time of such
repossession.   The lease further provided that the
lessor should, during the period of at least thirty days
before taking repossession, publish in two newspapers
printed in the city of New York a notice to the stock-
holders of the lessee of such default and intention to
resume the possession, and that the lessee might at
any time before the expiration of the thirty days'
notice stay all further proceedings by the pay-
ment of the amount then due.   The lessor further
covenanted that it would do and perform, at the
expense of the lessee, all such lawful acts and things
as might be requested by the lessee, in order to enable
the lessee to enjoy, use and exercise the property,
franchises and rights demised as fully to all intents
and purposes as the lessor might have done if the
lease had not been made.   This lease, the principal
terms of which have been thus summarized, was exe-
cuted by both corporations.   At the time the officers
of the two companies were identical and the boards of
directors nearly so.   It is admitted that the approval
of the lease by the Syracuse Company board was a
purely formal matter, being a mere adoption on behalf
of that company of what the same persons, or nearly
so, had already considered and approved on behalf of
the Lackawanna Company, the owner of more than
four-fifths of the Syracuse Company stock.   A meet-
ing of the stockholders of the Syracuse Company was

then called for the purpose of taking action upon the lease and it was approved by a vote of 23,078 shares, all of which were voted by proxies held by the president of the Lackawanna Company and of which 20,808 were owned by the Lackawanna Company. The holders of 615 shares, among them the plaintiff, voted against the proposed lease, and the remaining 1,307 shares were not represented at the meeting. The plaintiff is and was the largest single stockholder except the Lackawanna Company. The lease was, therefore, approved by the public service commission of the second district, the plaintiff having appeared before that body and opposed the application, and no review of the determination thus made has been sought. The greater part of the cash surplus of the Syracuse Company was then distributed among the stockholders in the form of a dividend of thirty per cent upon their shares. The plaintiff contends that, since the lease was arranged and agreed upon on behalf of both companies by boards of directors whose membership was substantially identical, it is entitled to have the same declared void and of no effect without regard to its actual fairness or otherwise. Its theory is that the board of directors of the Syracuse Company were trustees, or *quasi* trustees, for the corporation and its stockholders, and could not, therefore, be permitted to contract with themselves in another capacity. The plaintiff also claims that since it is conceded that the action of the board of directors of the Syracuse Company was purely formal and a mere ratification of what they had already resolved upon as directors of the Lackawanna Company, the lease must be set aside without inquiry as to its actual effect upon the interest of the stockholders, because a corporation is entitled to the actual and independent judgment of its directors upon any question upon which they take action.

There would be much force in these contentions if the transaction had stopped with the action of the directors; but it did not. The action of the directors was subsequently approved by a large majority of the stockholders, and the only question that survives their approval is whether their action has been so plainly unfair and oppressive of the minority stockholders that the court may interfere for the protection of the latter. *Gamble* v. *Queens County Water Co.,* 123 N. Y. 91; Cook Corp. (7th ed.), § 662. The plaintiff further contends that the lease is *ultra vires* because it goes very much beyond the contract for the use by one railroad corporation of the road or routes of another authorized by section 148 of the Railroad Law. It seems to be considered, however, that the power granted by this section was intended to be of a very broad character and to permit agreements which would result in the virtual abandonment of everything connected with the one road and the vesting of it in the other. *Wormser* v. *Metropolitan St. R. Co.,* 98 App. Div. 29, 37. The defendant railway companies contend at the outset that the determination of the public service commission, by which the lease in question was authorized in the face of the plaintiff's objection, makes the case *res adjudicata.* This, I think, is not so, since the public service commission is constituted not to protect the right of stockholders as between themselves, but to protect the rights of the public. *People ex rel. D. & H. Co.* v. *Stevens,* 197 N. Y. 1. See, also, dissenting opinion by Mr. Justice Laughlin in *Delevan* v. *N. Y., N. H. & H. R. R. Co.,* 154 App. Div. 8, 40. It seems quite manifest that the commission had no jurisdiction to conclude the stockholders as to their rights *inter se* in the controversy now before the court. The defendant railway companies also contend that the acceptance by plaintiff of the

thirty per cent dividend, distributed at the time the lease was made, estops the plaintiff from objecting to it. I find no merit in this contention. The extra dividend so received by the plaintiff was not paid under or pursuant to any terms of the lease; nor had the making of the lease anything to do with the creation of the fund out of which that extra dividend was paid. It was paid by taking a portion of the surplus that had accumulated before the making of the lease and which the directors had a right to distribute among the stockholders quite irrespective of the lease. The question to be determined is the one above stated, namely, whether the action of the majority of the stockholders has been so plainly unfair and oppressive of the minority that the court should interfere for the protection of the latter. I think such a case is presented. As already stated, the Syracuse Company is bound by the lease in question from time to time, during the continuance of the lease, at the request of the Lackawanna Company, to issue bonds or stock in such amount and to such extent as may be required by said Lackawanna Company for the various purposes set out in the lease, including such extensions or branches, or even other railroads as the Lackawanna Company may see fit to build. The Lackawanna Company is thus given the power to embark upon the most ambitious projects of extensions and new construction it may desire at no risk to itself, but wholly at the risk of the Syracuse Company. The Lackawanna Company has power under the lease to provide means for paying for such new construction and for retiring, refunding, paying, discharging or replacing the bonds or other obligations of the Syracuse Company theretofore issued, by calling upon the Syracuse Company to issue from time to time for the purposes named its bonds or other obligations or stock or parts of each

or either.   In discussing the providence or improvi-
dence of the lease from the standpoint of the interests
of the lessor, it is not necessary to show that every
one of the alternative courses permitted to the lessee
would result disastrously to the lessor.   If the lease
permits any one course that would have such result,
that is enough to stamp it as an improvident contract.
I will, therefore, not attempt at this point to discuss
what might be the consequences to the lessor if it
should be called upon to issue additional stock or any
form of obligations other than bonds and confine my
discussion to the consequences that might flow from
the issuance of new bonds to provide money for addi-
tional construction or other improvements.   In the
first place, it should be borne in mind that the Lacka-
wanna Company is not bound by anything in the lease
to pay or even to guarantee the payment of either the
principal or the interest of such new bonds.   Its obliga-
tion is carefully and explicitly limited to the debts of
the Syracuse Company existing at the date of the
lease, and that obligation, it may be remarked, is not
that of a guarantor, but it assumes the payment of
such debts and thus, as between itself and the Syra-
cuse Company, it becomes the principal debtor as to
such debts.   It seems, however, that this obligation is
of little importance either way, because the debts of
the Syracuse Company at the time the lease was made
were small.   On behalf of the Lackawanna Company it
is urged that the company is under obligation to guar-
antee the payment of such new bonds.   This claim was
not made in the pleadings nor at the trial nor any-
where in the record that I can recall, but is made now
in a supplemental brief.   Even now it is not claimed
that the lease itself imposes such an obligation, but
that it arises out of the act of the public service com-
mission, which, as a condition of approving the lease

31

which had been entered into between the two companies, insisted that the Lackawanna Company guarantee the payment of any bonds it might call upon the Syracuse Company to issue under the lease. I cannot see, however, that this action of the public service commission affects the question presented in this action, except, indeed, as showing that the commissioners were more alert, and with less necessity, in safeguarding the public interests, *i. e.*, the interests of any investors who might thereafter purchase such new bonds, than were the officers and directors and the stockholders of the Syracuse Company, who approved the lease, in safeguarding its interests. The public service commission did not require this provision as to the guarantee by the Lackawanna Company to be made a term of the lease. The function of the commission, as will be shown later more fully, is not to guard the rights of any party to the contracts submitted to it for approval, but to guard the rights of the public and to see that the statutes are complied with. The commission did not undertake, therefore, to alter the contract as between the parties, but approved it in its original form, but it did, acting in the interest of the public, require as a condition to its approval that the board of managers of the Lackawanna Company pass a resolution that in the event it requested the issuance of bonds under the lease it would guarantee their payment. The board of managers of the Lackawanna Company met the requirement of the public service commission by passing a resolution that the Lackawanna Company would guarantee payment of all such future bonds, but that requirement of the commission and that resolution of the Lackawanna Company do not thereby become a part of the agreement between the two companies. If the public service commission at some future time should decide that the public interest did not require

the continuance of that requirement, it could dispense with it and the Lackawanna Company could rescind its resolution and the Syracuse Company would be put back in the same position it is placed in by the terms of the lease. It is also urged in the supplemental brief of the defendant railroad companies that under section 55 of the Public Service Commissions Law the public service commission regulates the issuance of stock, bonds and other forms of indebtedness of the common carriers, railroad corporations or street railroad corporations. Such section, however, by the express language thereof, applies only to stocks, bonds, notes or other evidence of indebtedness, payable at periods of more than twelve months after the date thereof. *Goldan* v. *Delaware & Eastern R. Co.*, 144 App. Div. 78, 80. Even if the Lackawanna Company should request the Syracuse Company to issue its long-time bonds, the commissioners could not, in view of the terms of the lease, substitute their judgment for that of the directors and majority of stockholders of the Syracuse Company. *People ex rel. D. & H. Co.* v. *Stevens,* 197 N. Y. 1, 10, 11, 12. See, also, *People ex rel. Third Ave. R. Co.* v. *P. S. Comm.,* 203 id. 299. As was said by the court in *People ex rel. D. & H. Co.* v. *Stevens, supra,* at page 10: ''We do not think the legislation alluded to was designed to make the commissioners the financial managers of the corporation, or that it empowered them to substitute their judgment for that of the board of directors or stockholders of the corporation as to the wisdom of a transaction, but that it was designed to make the commissioners the guardians of the public by enabling them to prevent the issue of stock and bonds for other than the statutory purposes.'' And at page 12 the court further said: ''It was, therefore, evidently the legislative intent in the enactment of this provision

that the commissioners should have supervision over the issuing of long-time bonds to the extent of determining whether they were issued under and in conformity with the provisions of the statute for the purposes mentioned therein, or whether they were issued for the discharge of the actual and not the fictitious debts of the company, or whether they were issued for the refunding of its actual obligations and not for the inflation of its stocks or bonds. Beyond this it appears to us that the power of the commissioners *does not extend, unless it may pertain to the power* to determine whether an obligation should be classified as operating expenses, and as to whether such expenses should be paid by obligations running beyond a year.'' 'Considering the limitations of the functions of the public service commission, as set forth in the decisions above cited, it is plain that the Syracuse stockholders cannot safely depend upon any protection of their interests by the action of the public service commission under section 55 above referred to. The lease challenged must, therefore, in my opinion, stand or fall upon its own provisions, and cannot be supported by the present requirement of the public service commission or the statute just referred to. It remains, then, to consider what the situation will be if the Lackawanna Company proceeds at some future time to make improvements or additions, and to pay for them by bonds not guaranteed by itself. Although there is no requirement in the lease that the Lackawanna Company shall guarantee payment of either principal or interest of such new bonds, there is the unusual provision '' that in case the said party of the second part shall at any time refuse or neglect for the period of six months to make any of the payments of interest upon the mortgage bonds of the party of the first part, or interest at the rate of twelve

per cent. (12%) per annum on the capital stock, as hereinbefore provided, then and in such case the said party of the first part may, at its option, at any time within ninety (90) days thereafter, but not afterwards for that default, treat this lease as at an end, and at once resume and take and hold full possession and control of all the property by these presents leased and demised, free and clear of all rights and control of the party of the second part, the same as if this indenture and contract had not been made; *provided,* that the repossession of said property by the said party of the first part, under the option hereinbefore named, shall in no manner vitiate, release or discharge any legal claim or demand the party of the first part may have against the party of the second part by reason of any breach of these presents accruing at or before the time when the said party of the first part shall repossess themselves of such property; *and provided also,* that the said party of the first part shall, during the period of at least thirty (30) days before taking the repossession of said property, publish in two (2) newspapers printed in the City of New York a notice to the stockholders of the party of the second part of such default and intention to resume the possession of said property; and the party of the second part may at any time before the expiration of the thirty (30) days' notice above mentioned, stay all further proceedings by the payment of the amount then due.''. Several things should be observed with respect to the provision of the lease. *First,* there may be some question as to what application, if any, the words " as hereinbefore provided " have to the words " payments of interest upon the mortgage bonds of the party of the first part." There is no provision for payments of interest upon bonds anywhere else in the lease unless one

be implied from the assumption by the Lackawanna Company of the " bonds, debts, liabilities and undertakings " of the Syracuse Company existing at the date of the lease. The assumption of the payment of such existing bonds would, of course, include the obligation to pay the interest thereon. If the application of the provision just quoted is limited to the interest upon such bonds, if any, as were in existence on the date of the lease, and that seems a fair construction to put upon it, then it does not call for the payment by the Lackawanna Company for any purpose of interest on any new bonds that may be issued, and the issuance of new bonds does not impose upon that company the payment of any additional amount whatever. But, if it be held that it was not the intention of the provision under consideration to limit the meaning of the words " neglect  *  *  *  to make any of the payments of interest upon the mortgage bonds of the party of the first part " to bonds existing at the date of the lease, but to include bonds that might be issued thereafter, then it is to be noted that, while the lease permits the Lackawanna Company to call for the issuance by the Syracuse Company of any sort of bonds or obligations, this reference to payments by the Lackawanna Company of interest is expressly limited to mortgage bonds. If any kind of bonds other than mortgage bonds were issued, therefore, they would fail to come within the terms of this provision, whatever its meaning may be with respect to mortgage bonds. It is plain, therefore, that the Lackawanna Company could easily escape any additional burden upon itself under the terms of this provision by avoiding the issuance of mortgage bonds. But, even if it be held that neither of the above views is correct, and that the only way the Lackawanna Company could provide funds for new construction or for

improvements would be by the issuance of mortgage bonds, still the lease does not bind that company to pay interest on such new mortgage bonds, but at most merely provides that if it fails to do so then the Syracuse Company can terminate the lease and take back its property, which action would also terminate the obligation of the Lackawanna Company to make any further payments of the stipulated twelve per cent annual interest to the Syracuse stockholders because it is carefully provided in the lease that this obligation of the Lackawanna Company to make such annual payments to the Syracuse stockholders shall continue only during the enjoyment by the Lackawanna Company of the demised property. It is manifest, therefore, that the lease provides forever an easy and certain avenue of escape for the Lackawanna Company if its contract shall become burdensome to it. If the time ever comes when the rental value of the demised property in its present form becomes less than the rent reserved, then all the lessee has to do to secure relief from a bad situation is to make the experiment of additional expenditures for improvements or extensions. Such expenditures, so far as the provisions of the lease go, will fall upon the lessor exclusively, because the lease does not bind the lessee to become responsible for them even secondarily as a guarantor. If the new expenditures prove profitable and if the rental value of the enlarged property proves to be greater than the twelve per cent interest on the stock, plus the interest on the new bonds, then the Lackawanna Company can, and of course will, continue to make both payments and continue to enjoy the profits of the contract, and there is no way by which the Syracuse Company can regain its property, however great the profits become. But if the venture proves unprofitable and the earning power of the enlarged

and improved property is less than the amount of the stipulated twelve per cent on the stock, plus the interest on the new bonds, then the Syracuse Company will have to stand the loss. The Lackawanna Company in such a situation will pay the stipulated twelve per cent which is full performance of its obligation under the lease, and leave the interest on the new bonds unpaid, and the only penalty it will suffer for its failure to pay such bond interest will be the forfeiture, provided in the lease, of its right to continue the lease, and the only alternatives open to the unfortunate Syracuse Company will be either to pay such bond interest out of the twelve per cent rental received by its stockholders or otherwise and continue the lease or to exercise its option to terminate the lease because of the failure of the Lackawanna Company to pay such bond interest, which action, as shown, would exempt the Lackawanna Company from further payment of rental or other liability under the lease. If the Syracuse Company should not pay such bond interest on the failure of the Lackawanna Company to do so, it would of course lose its property at the hands of the bondholders, either under foreclosure or execution, and its stockholders would lose all their rights, including the right to the twelve per cent interest payable under the lease. Its only alternative would, therefore, be either to terminate the lease and allow the lessee to escape from a burdensome contract or to allow the lessee to enjoy the enlarged and more expensive property without any increase in rental. Instead of being a lease binding upon the lessee under all circumstances, it is in reality an option given to the lessee to make any additions or improvements it sees fit to the demised premises and then to decide, after the event has demonstrated whether the new expenditures are wise or not, whether it will exercise its option to

pay the interest on the new bonds and continue its right to hold the demised property under its lease or whether it will elect not to pay that interest and merely pay the rental originally fixed and force the landlord either to terminate the lease and the tenant's liability thereunder or to permit the tenant to enjoy the enlarged and more expensive property without paying anything more than the original rent.  To put the case shortly, if the lease never becomes distinctly to the advantage of the lessor that fact will set the lessee in motion to take advantage of the means afforded it by the lease to escape the burden of an unprofitable contract.  It is also worthy of note that the provision for the retaking of its property by the Syracuse Company does not provide for any continued liability on the part of the Lackawanna Company for the rental reserved or for any future damages, and even the right of the Syracuse Company to retake its property is rigidly limited to a period of ninety days.  If the directors and officers of the Syracuse Company, who are now and presumably will continue to be practically the same as those of the Lackawanna Company, should not act upon the default of the Lackawanna Company it might leave the lessor road and its minority stockholders in a serious situation.  So far I have proceeded upon the theory that bonds for new construction might be issued without the guarantee of the Lackawanna Company.  But if it be assumed that such bonds will have the guarantee of that company the result is not changed.  The only difference would be that the injury to the interests of the Syracuse Company might be worked out in a slightly different way.  If the bondholders should proceed directly against the Syracuse Company, as the principal debtor, and its property, then there would be no difference, even in

method. If, however, they should proceed against the Lackawanna Company as guarantor, then that company, as a guarantor who had been forced to pay the debt of its principal, would step into the shoes of such bondholders and become possessed of all their rights against the Syracuse Company, and the injury to the interest of that company would ultimately be the same. But, quite irrespective of what has been said above with respect to new bonds of the Syracuse Company and the methods by which the Lackawanna Company by the use of such bonds might bring disaster to the Syracuse Company, there is another way provided in this extraordinary lease by which the lessee company may improve or enlarge the demised property wholly at the expense of the lessor company and without incurring even a debatable chance of having to pay any increase of rent in order to retain the use of the greater and more valuable property. The lease gives the lessee company the right to call for the issuance of stock, bonds or other securities by the lessor company, but nowhere is there any provision that the failure of the lessee company to pay income on such new stock or on any form of such securities other than mortgage bonds shall give the lessor company the right to end the lease and take back its property. Consequently any improvement or enlargement of the property which the lessee company might be able to make through the issuance of stock or securities other than mortgage bonds would unquestionably be a clear, net gain to that company and would not at all increase the rental which it would have to pay in order to retain the possession of the demised property. The case presented seems so plainly to be one where all the risk of loss is thrown upon the lessor and all the chance of gain to the lessee that the intervention of the court is required in the interest of the minority

stockholders. The lease seems so glaringly unfair to the Syracuse Company that the action of the many minority stockholders who voted in its favor is inexplicable unless on the ground that their interest in the Lackawanna Company was greater proportionately than in the Syracuse Company or that they gave no thought at all to the proposed contract and in blind confidence gave their proxies for the stockholders' meeting to persons whose chief interest lay with the Lackawanna Company. My conclusion is that the plaintiff is entitled to judgment as prayed for, with costs. The question of an additional allowance will be passed upon when the requests for findings of the respective parties are submitted. Briefs relative to this subject may accompany such requests. There might be considerable difficulty in framing a judgment for relief which would be precisely appropriate to the situation presented, but the plaintiff only asks judgment canceling the agreement, directing a return of the property granted or demised and requiring the Lackawanna Company to account for and pay to the Syracuse Company all moneys and property received under and pursuant to the terms of the agreement, less the amount already paid to the stockholders of the Syracuse Company. If my conclusions upon the merits of the case are right it would seem that the judgment demanded is as favorable to the Lackawanna Company as it would have the right to require. If, in the light of the views I have expressed above, any of the parties desire to submit additional or amended requests for findings, such requests should be submitted, with proof of service, within ten days after the publication of this opinion.

Ordered accordingly.